**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
lrosen@rosenlegal.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHAYAN SALIM, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MOBILE TELESYSTEMS PJSC, ANDREI A. DUBOVSKOV, ALEXEY V. KORNYA, and ANDREY KAMENSKY,<br><br>Defendants. | Case No. 1:19-cv-01589-AMD-RLM<br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

Plaintiffs, individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Mobile TeleSystems Public Joint Stock Company ("MTS" or "Mobile TeleSystems" or the "Company"),

analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of Mobile TeleSystems from March 19, 2014 through March 7, 2019, both dates inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. From 2004 to 2012, MTS, its wholly owned subsidiary, and certain of their executives and management conspired to pay bribes in violation of U.S. law totaling at least $420,825,848 for the benefit of an Uzbek government official in order to enter and continue to operate in the Uzbek telecommunications market. MTS and its management understood that they had to regularly make payments to benefit the Uzbek official—Gulnara Karimova—in order to continue to do business in Uzbekistan (Karimova is sometimes referred to herein as "Foreign Official").

3. In or around the summer of 2004, MTS acquired 74% of Uzdunrobita[1] by purchasing a 41% stake from an American company and a 33% stake from Shell Company A. At the time of the acquisition, MTS knew that Shell Company A was beneficially owned by

[1] Capitalized terms are defined below.

Karimova. MTS paid Shell Company A for Karimova's benefit approximately $100 million for a 33% stake in Uzdunrobita, which represented a price of six times more per share than MTS paid for the American company's 41% stake. At least a portion of the payment to Shell Company A was made in exchange for Uzdunrobita's ability to operate in Uzbekistan. Shell Company A retained 26% of Uzdunrobita. MTS and Shell Company A agreed that either could exercise an option to buy or sell this remaining stake for approximately $37.7 million, plus interest, in three years.

4. In or around 2006, at Foreign Official's demand, MTS and Shell Company A agreed to amend the option agreement. Instead of having a fixed price for the remaining stake in Uzdunrobita, MTS and Shell Company A agreed that the option would be priced at market value. The amendment was made for the benefit of Foreign Official in exchange for allowing Uzdunrobita to continue to operate in Uzbekistan. In or around 2007, Shell Company A exercised its option to sell its remaining stake in Uzdunrobita, and MTS paid Shell Company A approximately $250 million, resulting in Foreign Official receiving a much higher purchase price than contemplated under the original option agreement.

5. In or around 2008, MTS and Shell Company B entered into an agreement in which MTS agreed to pay $30 million to Shell Company B for Foreign Official's benefit in exchange for Shell Company B's subsidiary repudiating various telecommunications frequencies and the reassignment of those frequencies by UzACI to Uzdunrobita. MTS paid that amount to Shell Company B for Foreign Official's benefit to obtain the frequencies and to continue to operate in Uzbekistan.

6. In or around 2009, MTS and Uzdunrobita acquired KOLORIT, an Uzbek advertising company. Certain MTS management knew that the price paid by MTS for KOLORIT

was inflated to $39.6 million in order to compensate Foreign Official in exchange for Uzdunrobita continuing to operate in Uzbekistan.

7. In or around 2012, Uzdunrobita paid approximately $1.1 million in bribes in violation of U.S. law to entities related to Foreign Official for purported charities or sponsorships.

8. The last corrupt payment in violation of U.S. law for the benefit of Foreign Official was made no later than May 2012. After that time, MTS and Uzdunrobita did not satisfy Foreign Official's demands for additional payments. In retaliation, Foreign Official used her influence with the Uzbek government to expropriate Uzdunrobita.

9. In March 2019, the DOJ unsealed a deferred prosecution agreement between MTS and the Department of Justice in connection with a criminal information filed in the Southern District of New York charging the Company with one count of conspiracy to violate the anti-bribery and books and records provisions of the FCPA and one count of violating the internal controls provisions of the FCPA (the “DPA”).

10. Pursuant to the DPA, MTS agreed to pay a total criminal penalty of $850 million to the United States, including a $500,000 criminal fine and $40 million in criminal forfeiture that MTS agreed to pay on behalf of KOLORIT. The $850 million criminal penalty—which was one of the largest in United States history for FCPA violations—was 25% ***above*** the low-end of the Sentencing Guidelines fine range because MTS insufficiently cooperated with the investigation and did not appropriately remediate its internal controls. Due to its failure to appropriately remediate at the time of the DPA, MTS agreed to the imposition of an independent compliance monitor for a term of three years.

11. In the DPA, MTS “admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the

Information, and as set forth in the Statement of Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate."

12. While MTS's illegal bribery scheme apparently came to an end in 2012, Defendants continued defrauding investors through 2019 by issuing false and misleading statements about the Company's liability for its illegal bribery scheme, the effectiveness of the Company's internal controls and compliance, and the Company's cooperation with US investigators.

13. Throughout the Class Period, Defendants repeatedly stated that MTS was cooperating with the SEC and DOJ investigations. These statements are important to investors because the FCPA Corporate Enforcement Policy directs the DOJ to impose financial penalties significantly ***below*** the low-end of the Sentencing Guidelines fine range when companies are fully cooperative with investigators. In direct contradiction to Defendants' claims of cooperation, the DPA revealed that MTS "significantly delayed production of certain relevant materials [and] refused to support interviews with current employees during certain periods of the investigation."

14. Throughout the Class Period, Defendants repeatedly touted the effectiveness and thoroughness of the Company's internal controls and compliance. A company's statements about its internal controls and compliance are particularly important to investors in the context of an ongoing investigation for FCPA violations because the FCPA Corporate Enforcement Policy directs the DOJ to impose financial penalties significantly ***below*** the low-end of the Sentencing Guidelines fine range when companies have remediated their prior non-compliance with the FCPA's internal controls requirements. Contrary to Defendants' statements touting the Company's internal controls and compliance, the DPA revealed that MTS "did not appropriately remediate, including by failing to take adequate disciplinary measures with respect to executives and other employees involved in the misconduct." The Company's failure to remediate led, in part, to the

Company's financial penalty being 25% ***above*** the low-end of the Sentencing Guidelines fine range. If MTS had fully cooperated with the investigation and adequately remediated its internal controls and compliance—as Defendants falsely claimed throughout the Class Period—***MTS would have been faced with a Total Monetary Penalty nearly $350 million less than the $850 million that MTS ended up paying***.

15. Throughout the Class Period, Defendants also concealed from investors the enormous financial liability caused by their FCPA violations, even after the DOJ and SEC identified the specific violations to the Company.

16. Because it was probable that MTS would incur a material financial penalty for its FCPA violations, applicable accounting principles required that it record a charge against income for the likely amount of the financial penalties it would incur. Applicable accounting principles also required that if Defendants did not believe it was probable that MTS would incur a material liability, it was required to disclose in detail the nature of the potential FCPA liability and an estimate or range of the FCPA liability MTS faced.

17. MTS's failure to record or disclose an estimate of its FCPA liability violated accounting principles and rendered all of its financial statements false and misleading during the Class Period.

18. The truth began to be revealed to investors on November 20, 2018, On November 20, 2018, the Company disclosed that it had reserved approximately $840 million USD (RUB 55.8 bln) as the potential liability concerning investigations by the SEC and the DOJ into its former operations in Uzbekistan. On this news, shares of MTS' stock price fell $0.64 per share or nearly 8% to close at $7.45 per share on November 20, 2018.

19. Investors finally learned the full truth about MTS' FCPA violations and failure to cooperate and remediate when the DOJ unsealed the DPA on March 7, 2019. On this news, shares in MTS' stock fell $0.24 per share or over 3% to close at $7.54 per share on March 7, 2019, damaging investors.

## JURISDICTION AND VENUE

20. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

21. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

22. Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this district.

23. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

24. Lead Plaintiff Hunnewell Partners (UK) LLP, as set forth in the previously filed Certification incorporated herein by reference, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelations of the alleged corrective disclosures.

25. Named Plaintiffs Xiangqun Miao and Shayan Salim purchased the Company's securities at artificially inflated prices during the Class Period and were damaged upon the revelations of the alleged corrective disclosures.[2]

26. Defendant Mobile TeleSystems purports to provide telecommunication services in Russia, Ukraine, Turkmenistan, and Armenia. The Company is incorporated in the Russian Federation with headquarters in Moscow, Russia. The Company's securities are traded on the New York Stock Exchange ("NYSE") under the ticker symbol "MBT."

27. Defendant Andrei Dubovskov a/k/a Andrey Dubovskov ("Dubovskov") served as the Company's President and Chief Executive Officer ("CEO") from around 2011 until 2018. Dubovskov joined MTS in 2004 as head of the Company's operations in Nizhny Novgorod. In 2006, he went on to become head of Macro-region Ural. In the beginning of 2008, Dubovskov became Head of Business Unit MTS Ukraine, the Company's second largest business unit in terms of revenues

28. Defendant Alexey V. Kornya ("Kornya") has served as the Company's CEO since around March 2018. Prior to that, Kornya served as the Company's Vice President and Chief Financial Officer ("CFO") beginning in 2010. Kornya joined the Company in 2004 as the Chief Financial Officer of MTS Ural macroregion. Between 2004 and 2007, he was Director of MTS Group for Business Planning. In March 2007, he was appointed Chief Financial Controller of MTS Group. In 2008, Kornya was appointed acting Vice President and in 2010 began his tenure as Vice President, Finance and Investment, at MTS PJSC. Since June 2016, he has been Vice President for Finance, Investments, Mergers & Acquisitions.

---

[2] Salim's previously filed Certification is incorporated herein by reference, and Miao's Certification is annexed hereto as Exhibit 1.

29. Defendant Andrey Kamensky a/k/a Andrey Kamenskiy ("Kamensky") has served as the Company's CFO since around April 2018.

30. Defendants Dubovskov, Kornya, and Kamensky are sometimes referred to herein as the "Individual Defendants."

31. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

32. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

33. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

34. The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## RELEVANT NON-PARTIES

35. The Uzbek Agency for Communications and Information ("UzACI") was an Uzbek governmental entity authorized to regulate operations and formulate state policy regarding communications, information technology, and the use of radio spectrum in Uzbekistan.

36. In or around 2004, MTS began operating its mobile telecommunications business in Uzbekistan through its subsidiary Uzdunrobita LLC ("Uzdunrobita"), which was headquartered and organized in Uzbekistan. From in and around 2004 to 2012, MTS held between 74% and 100% of the shares of Uzdunrobita. MTS acquired its ownership interest in Uzdunrobita, in part, from the purchase of all shares held in Uzdunrobita from an American company ("American Company"), whose identity is known to the United States. American Company was incorporated and headquartered in the state of Georgia.

37. Oleg Yuryevich Raspopov was appointed acting Vice President, Director of MTS-Foreign Subsidiaries Business Unit in March 2007 and served as Vice President, Director of MTS — Foreign Subsidiaries Business Unit from January 2008 to February 2013. The DPA and the verified complaints filed by DOJ and SEC identify Raspopov under the pseudonym "Executive 1," a high-ranking executive of MTS who had authority over MTS's foreign subsidiaries from 2007 to 2013.

38. Bekhzod Akhmedov was the General Director of Uzdunrobita from 2002 to 2012. Akhmedov was charged with one count of conspiracy to violate the FCPA, two counts of violating the FCPA, and one count of conspiracy to commit money laundering in an indictment filed in the Southern District of New York on March 7. The DPA and the verified complaints filed by DOJ

and SEC identify Akhmediv under the pseudonym "Executive 2," a high-ranking executive of Uzdunrobita from 2002 to 2012. From 2007 to 2012. Akhmedov reported to Raspopov at all times.

39. The DPA and the verified complaints filed by DOJ and SEC identify Karimova under the pseudonym "Foreign Official," an individual whose identity is known to the United States, was a relative of a high-ranking Uzbek government official and an Uzbek government official, including Uzbek Deputy Minister of Foreign Affairs for Cultural Issues and Uzbekistan's Ambassador to the United Nations. Foreign Official had influence over decisions made by UzACI. Karimova, a citizen of Uzbekistan, was charged in an indictment filed in the Southern District of New York on March 7 with one count of conspiracy to commit money laundering. Karimova is a former Uzbek official who allegedly had influence over the Uzbek governmental body that regulated the telecom industry.

40. "Shell Company A" was a company incorporated in Gibraltar that was beneficially owned by Foreign Official.

41. "Associate A," an individual whose identity is known to the United States, was Foreign Official's close associate and was the purported sole owner and director of Shell Company A.

42. "Shell Company B" was a company incorporated in Gibraltar that was beneficially owned by Foreign Official.

43. "Associate B," an individual whose identity is known to the United States, was Foreign Official's close associate. When Shell Company B was incorporated in 2004, Associate B was approximately 20 years old and was Shell Company B's purported sole owner and director.

44. KOLORIT DIZAYN INK Limited Liability Company ("KOLORIT") was an advertising company organized under the laws of Uzbekistan. In 2009, Uzdunrobita acquired KOLORIT. Foreign Official was an ultimate beneficiary of that transaction.

## SUBSTANTIVE ALLEGATIONS

### I. MTS Corruptly Enters the Uzbek Market[3]

45. In or around 2004, MTS sought to enter the Uzbek telecommunications market by acquiring Uzdunrobita. MTS paid a portion of the purchase price of Uzdunrobita to Shell Company A for the benefit of Foreign Official.

46. Certain MTS management knew that Uzdunrobita's majority shareholder at that time, Shell Company A, was beneficially owned by Foreign Official, who also served as the Chairman of Uzdunrobita during two 2004 shareholder's meetings. On or about July 14, 2004, MTS executed a share purchase agreement with Shell Company A under which MTS agreed to pay Shell Company A $100 million in exchange for a 33% stake in Uzdunrobita. On or about the same day, MTS and Shell Company A executed a Put and Call Option Agreement (the "Option Agreement") under which MTS had the option to buy, and Shell Company A had the option to sell, Shell Company A's remaining 26% interest in Uzdunrobita for $37.7 million plus interest during the next three years. On or about July 15, 2004, MTS executed a separate share purchase agreement with American Company, under which MTS agreed to pay American Company $21 million for a 41% stake in Uzdunrobita. These agreements falsely stated that the transactions had

---

[3] The allegations in subsections I-VIII of the Substantive Allegations section are taken from the DOJ's criminal Information against MTS and the Statement of Facts of the Deferred Prosecution Agreement between MTS and the DOJ. The Company has admitted that these allegations are true and accurate. The Information, filed on March 6, 2019, is annexed hereto as Exhibit 2 and incorporated by reference herein. The United States v. Mobile TeleSystems PJSC Deferred Prosecution Agreement, dated February 22, 2019, is annexed hereto as Exhibit 3 and incorporated by reference herein.

been “duly and validly authorized by all required action” by MTS, when, in fact, MTS's Board of Directors did not approve the transactions until on or about July 26, 2004.

47. Pursuant to these agreements, MTS paid Shell Company A approximately six times as much per share of Uzdunrobita as it paid to American Company. MTS paid the extra amount to Shell Company A in exchange for Uzdunrobita's ability to operate in Uzbekistan.

48. In or around March 2004, MTS had estimated Uzdunrobita to be valued at approximately $57.8 to $73.9 million. However, four months later in or around July 2004—at the time of MTS's acquisition of Uzdunrobita—MTS documents listed Uzdunrobita's value as between $138.6 and $188.4 million.

49. On or about July 29, 2004, MTS transferred approximately $ 100 million to an escrow account for the benefit of Shell Company A in the United Kingdom. On or about August 2, 2004, certain MTS management, including Executive 2, executives from American Company, Foreign Official, and others attended the deal closing ceremony for MTS's acquisition of Uzdunrobita. Foreign Official presided over the meeting as Chairman of Uzdunrobita and signed the meeting minutes. On or about August 9, 2004, the escrow agent for the United Kingdom account transferred approximately $100 million to Shell Company A's bank account in Latvia through correspondent bank accounts at financial institutions in New York, New York.

**II. MTS Pays $250 million in Bribes in 2007**

50. In or around August 2006, at the demand of Foreign Official, certain MTS management and Foreign Official, through Executive 2, negotiated an amendment to the Option Agreement that served to increase the purchase price for Shell Company A's remaining stake in Uzdunrobita. The amendment benefited Foreign Official by eliminating MTS's call option, extending the time period for Shell Company A's put option, and removing the fixed exercise price

of $37.7 million plus interest. The amended agreement instead allowed the value of the shares to be determined by an international investment bank selected by the parties. Given that Uzdunrobita's value had increased significantly from 2004, in part due to Foreign Official's influence, certain MTS management understood that the amended option agreement conferred a significant pecuniary benefit for Foreign Official.

51. On or about August 15, 2006, Associate A signed a resolution allowing Shell Company A to approve the amendment of the Option Agreement. On or about August 17, 2006, MTS and Shell Company A entered into a new agreement that amended the terms of the Option Agreement (the 'Amended Option Agreement"). Certain MTS management did not obtain the approval of MTS's Investment Committee or MTS's Board of Directors for the amendment and only informed MTS's Investment Committee after the amendment agreement had been executed.

52. After the Amended Option Agreement was entered into, but before the option was executed, a new MTS executive learned of the relationship between MTS and Shell Company A. In or around February 2007, the new executive began to raise concerns, including the FCPA risk MTS faced if Shell Company A was, in fact, beneficially owned by Foreign Official.

53. On or about February 7, 2007, the new executive emailed certain MTS management concerning the risk of doing business with Shell Company A because "in the open sources, there are speculations as to the connections of this company and the current [Uzbek] regime." The new executive called for a "confidential investigation of the beneficiary owners" of Shell Company A.

54. On or about February 12, 2007, the new executive emailed certain members of MTS's management concerning new information the new executive had learned through an investigation of public sources and the new executive's consequent heightened concerns. The new executive explained, "[w]e need to ensure, by obtaining a third party opinion ... that Shell Company

A and its beneficiaries and officers do not have any connections to [a high-ranking Uzbek government official's] family or to government officials of Uzbekistan." The new executive continued, "We need to re-check the previous transaction for acquisition of Uzdunrobita to make sure there are no risks of potential persecution for the purchase of shares from [Foreign Official] (if they were actually purchased from [Foreign Official])." The new executive emphasized, "From the reputational point of view, we should exclude any association between MTS and [Foreign Official] — [a] profile is attached."

55. The new executive attached to the February 12, 2007 email a series of articles about Foreign Official from internet sources, which included that: Foreign Official had set up Shell Company A, which "received" 20% of Uzdunrobita from American Company and 31.4% from the Uzbek government; Foreign Official had an official role in the Uzbek government and influence with a high-ranking Uzbek government officials; Foreign Official had amassed a "large business empire" through "corrupt means" and that part of Foreign Official's holdings was "the largest wireless telephone operator in Uzbekistan," which, at the time, was Uzdunrobita; and Foreign Official had substantial influence in the Uzbek government, including in the telecommunications sector.

56. In addition to the articles above, the new executive also attached a memo to his February 12, 2007 email, which stated that MTS faced FCPA risks because "[i]n public sources, including transcripts of court proceedings, it was stated that in 2004, [MTS] acquired a majority stake in 'Uzdunrobita' in the transaction, where one of the selling shareholders was [Foreign Official]." The memo further noted that the high-ranking Uzbek government official related to Foreign Official "held office at the time of the transaction." The memo ended with a list of risks

that included, "1) Reputational risk— [Foreign Official]," "2) FCPA risk," and "3) the risk of a regime change and of the revision of the privatization/acquisition of licenses."

57. In response to the new executive's emails, certain MTS management took steps to restrict further dissemination of the new executive's concerns about the Foreign Official.

58. Because the new executive insisted that MTS conduct additional due diligence, MTS hired a U.S. law firm to conduct due diligence on Shell Company A. In an effort to ensure that the legal opinion would be favorable, certain MTS management did not disclose certain relevant information to the law firm, including the crucial fact that certain MTS management knew that Foreign Official was the beneficial owner of Shell Company A.

59. On or about April 2, 2007, in part due to Foreign Official's influence, UzACI granted Uzdunrobita licenses for additional frequencies.

60. On or about April 12, 2007, Shell Company A sent notice to MTS of its intention to exercise its put option under the Amended Option Agreement. On or about April 27, 2007, MTS and Shell Company A jointly engaged an investment bank to value Shell Company A's remaining interest in Uzdunrobita. The bank estimated that 26% of Uzdunrobita was worth approximately $250 million, including 26% of the value of the additional licenses.

61. On or about May 25, 2007, certain MTS management circulated a presentation about MTS's negotiating position regarding the deal, including expressing concern that Foreign Official would expect that the entire value of the licenses would be added to the price for 26% of Uzdunrobita's shares, ultimately demanding a payment of $375 million. The presentation noted that MTS would be "deprived of protection from [the] consequences of loss of partner [*i.e.*, Foreign Official]."

62. On or about June 26, 2007, MTS's Board of Directors approved the $250 million payment to Shell Company A. On or about June 28, 2007, MTS transferred approximately $250 million to Shell Company A's bank account in Hong Kong, via wire transfers through correspondent bank accounts at financial institutions in New York, New York.

63. During this time period, Foreign Official was also utilizing Executive 2 to negotiate similar bribe payments from MTS's and Uzdunrobita's competitors, Unitel and Coscom, as also admitted by Unitel and Coscom. Specifically, Executive 2 helped Foreign Official obtain a 26% ownership interest in both Unitel and Coscom, through Shell Company A, with the knowledge of certain MTS management. Certain MTS management permitted Executive 2 to assist its competitors because it understood that doing so would allow MTS to continue to do business in the Uzbek telecommunications sector.

**III. MTS Pays An Additional $30 million in Bribes in 2008-2009**

64. On or about April 15, 2008, Executive 2 emailed Executive 1 concerning a letter from UzACI. Attached to the email was a notice from UzACI concerning purportedly bad connection quality for local and inter-city calling in violation of Uzdunrobita's license. The notice stated that if those violations were not corrected within one month, Uzdunrobita's license could be suspended or revoked. Later that day, Executive 1 forwarded the email to certain MTS management, stating that Executive 2 "had warned us that [Foreign Official] will be taking revenge" for MTS's decision to decline to engage in another transaction for the benefit of Foreign Official.

65. On or about April 15, 2008, Executive 2 forwarded Executive 1 another adverse letter from an Uzbek state-owned entity. Executive 1 forwarded the letter to certain MTS management stating, "Continuation of the pressure."

66. During the summer of 2008, certain MTS management continued to discuss how to address Foreign Official's demands for additional improper payments. On or about July 3, 2008, Executive 1 emailed certain MTS management a list of the "Problems in Uzbekistan." The list included official currency conversion, "[p]eriodic (initiated by the [Foreign Official] or by [Executive 2]) claims of the [telecom] regulator ...," and Executive 2's "participation in [C]oscom Company [a competitor of Uzdunrobita] management (more than 30% belong to [Foreign Official]."). Executive 1 noted several problems, including Executive 2's "connections in the state authorities under [Foreign Official's] auspices" and that the frequencies that Foreign Official was offering lacked "legal 'cleanliness'" because they "were taken away illegally." In offering solutions, Executive 1 suggested "direct bargaining with [Foreign Official]" for telecommunications licenses, construction and operation permits, and currency conversion and that there be an "amount of annual subscription fee for 'happiness,' but under our management." To accomplish this, Executive 1 suggested a "direct meeting with [Foreign Official] and [a high-ranking MTS executive]" without Executive 2's "knowledge and participation."

67. On or about July 20, 2008, Executive 1 emailed certain MTS management asking for input on an attached memo. The memo explained that "[t]he Third Party [Foreign Official] is making a demand that [MTS] pay $50 mln ..." The memo cautioned, however, that "outright rejection of the payments" or replacement of Uzdunrobita's management could lead to potential consequences, including "the Third Party [*i.e.*, Foreign Official] creating difficulties (of various kinds)" for Uzdunrobita's business, "suspension" of Uzdunrobita's operations, or the forced sale of Uzdunrobita. Executive 1 noted that there were not "available legal options" to "provide reliable protection from the Third Party [*i.e.*, Foreign Official]." The memo went on to explain that a "decision has been made to resume direct negotiations with the Third Party [*i.e.*, Foreign Official]"

and discussed in detail possible payment methods for the benefit of Foreign Official and various governmental benefits that MTS hoped it could obtain, including "expansion of existing licenses," currency conversion, and tax and customs benefits.

68. Thereafter, an MTS foreign subsidiary entered into a contract with Shell Company B, whose beneficial owner certain MTS management knew was Foreign Official. Under the proposed contract, the foreign MTS subsidiary would pay Shell Company B approximately $30 million in exchange for Shell Company B's subsidiary repudiating various telecommunications frequencies and the reassignment of those frequencies by UzACI to Uzdunrobita.

69. On or about August 19, 2008, certain MTS management sent a due diligence firm incorporation information about Shell Company B, including Associate B's name.

70. Certain MTS management, however, did not provide the due diligence firm with certain relevant information concerning Shell Company B, including the crucial fact that certain MTS management knew that Foreign Official beneficially owned Shell Company B.

71. One day later, on or about August 20, 2008, before the due diligence was completed on the transaction, Executive 2 emailed certain MTS management, including Executive 1, a copy of a finalized but undated agreement between an MTS foreign subsidiary and Shell Company B, signed by Associate B. Executive 2 explained, "I need to get info from you about the date they shall be dated, because I should start processing tra[n]sfer of frequencies to Uzdunrobita [...] today." The executed agreement between an MTS foreign subsidiary and Shell Company B was dated August 21, 2008. On or about August 28, 2008, certain MTS management, copying Executive 1, emailed the executed agreement with Shell Company B to Executive 2.

72. In or around this time, certain MTS management discussed the need for Board of Directors approval of the loan between MTS and the MTS foreign subsidiary that would fund the

agreement. On or about August 22, 2008, Executive 1 emailed certain MTS management that "[w]e will do a little work on the justification for the Board of Directors," and asked certain MTS management, "please come up with something non-traditional, deadline is Aug 29."

73. On or about August 25, 2008, UzACI issued an order allocating the frequencies earlier repudiated by Shell Company B's subsidiary to Uzdunrobita.

74. On or about August 29, 2008, an executive at the due diligence firm sent certain MTS management an email with a draft report on Shell Company B. The email explained that although "some enquires remain outstanding, I hope the report contains the idea as to how the main angle — that is FCPA — is affected." The report referred to information that Shell Company B was "beneficially owned by the family of [a high-ranking Uzbek government official]," and that Associate B was "a trustee of [Foreign Official]" and worked for Foreign Official. The report further documented international press articles that also reported that Shell Company B was beneficially owned by the family of a high-ranking Uzbek government official. It also noted that Shell Company B was a minority owner of both of Uzdunrobita's competitors in Uzbekistan, Unitel and Coscom.

75. Despite the issues raised in the due diligence report, MTS continued to execute the agreement with Shell Company B. On or about September 4, 2008, the Board approved a funding mechanism in the form of a $30 million loan to the foreign subsidiary. The Board was advised only that the loan was "[f]or financing of operational activity and possible implementation of projects in the future."

76. On or about September 5, 2008, MTS entered into a $30 million loan agreement with its foreign subsidiary to fund the agreement between the MTS foreign subsidiary and Shell Company B.

77. On or about September 19, 2008, Executive 1 sent certain MTS management an email with the subject "question re: U" with no content. Attached to the email was a PowerPoint slide listing the "Status of our requests" and the "Status of our commitments." The requests listed were various governmental benefits, including currency conversion, tax benefits, and a bilateral agreement with the Uzbek government on the protection of investments, noting that the requests had been refused except that Foreign Official accepted "a request for conversion of $3 million for the repayment of the Company's outstanding debts." The slide identified MTS's commitments as "a payment of the total amount of $50 million" and "[beginning in 2009, for the assistance in creating favorable conditions for the growth of the Company and its subscriber base, guarantee [of] the payment of an average of $20 million/year." Beneath the $50 million figure, the slide noted "$30 million through the purchase of [telecommunications] frequencies, prior to 01/11/08" followed by "MTS is ready to make the payment immediately."

78. On or about the following dates, MTS, or an MTS foreign subsidiary, made the following payments to Shell Company B's bank accounts for Foreign Official's benefit, via wire transfers through correspondent bank accounts at financial institutions in New York, New York.

| **Date** | **Sender** | **Recipient** | **Recipient's Bank** | **Amount** |
|---|---|---|---|---|
| October 21, 2008 | MTS | Shell Company B | Riga, Latvia | $5,000,000 |
| February 6, 2009 | MTS subsidiary | Shell Company B | Hong Kong | $ 5,000,000 |
| March 5, 2009 | MTS subsidiary | Shell Company B | Hong Kong | $ 5,000,000 |
| April 28, 2009 | MTS subsidiary | Shell Company B | Hong Kong | $ 5,000,000 |
| June 17, 2009 | MTS subsidiary | Shell Company B | Hong Kong | $ 5,000,000 |
| My 14, 2009 | MTS subsidiary | Shell Company B | Hong Kong | $ 5,000,000 |

79. On or about November 2, 2009, Executive 1 emailed himself a presentation including an updated copy of the slide referenced in paragraph 51. The updated version of the slide stated that MTS's obligations relating to a "[telecommunications] frequencies acquisition for $30 mln by 01.11.08" were "Paid in full in July 2009."

**IV. Corrupt Payment of $39.6 Million Through Acquisition of KOLORIT in 2009**

80. As discussed in paragraph 41, on or about July 20, 2008, Executive 1 emailed certain MTS management a memo stating that "[t]he Third Party [Foreign Official] is making a demand that [MTS] pay $50 mln ...." "by acquiring an asset" whose value was "overstated," which was "unattractive" to MTS's "development strategy" and whose size would be "impossible to explain to the investment community."

81. As discussed in paragraph 51, on or about September 19, 2008, Executive 1 sent certain MTS management a slide indicating a $50 million commitment to Foreign Official for various government benefits. The slide showed that, after the $30 million for the agreement with Shell Company B was taken into account, the remaining balance was "$20 million." The slide also contemplated an additional "$20 million/year" for "assistance in creating favorable conditions for the growth of the company." Both amounts were followed by the notations, "The basis for payment and the draft agreement are being worked out." The slide noted that "no scheme exists other than making the payment as a fee for services. Proposing to increase the amount of the contract pertaining to [telecommunications frequencies], with delayed payments."

82. On or about December 11, 2008, certain MTS management, including Executive 1, received a report about the possible acquisition of KOLORIT. The report noted that KOLORIT was "connected to MTS by a long history of relations" and that it "was created by the same shareholders as Uzdunrobita before it." Noting that MTS and KOLORIT had articulated reasons for the acquisition, the report stated that "[i]n my opinion, the main reason [for the acquisition] is the interest of the founders on the Uzbekistani side and certain internal agreements. [KOLORIT] was created and developed exclusively as a result of activities of the founders of Uzdunrobita; a clear connection is maintained today as well." The report further noted that "the reason for the sale

of KOLORIT for [KOLORIT]'s ownership is unclear," that KOLORIT did not need the sale for its development, and that "maybe, there are hidden economic factors that will not be disclosed to an external expert."

83. On or about April 9, 2009, certain MTS management wrote Executive 1, stating that the KOLORIT "transaction is a toxic one" and that "I think that we need to get the transaction to [MTS's Investment Committee]. Let [certain MTS management] and the [Investment Committee] members share liability."

84. On or about July 28, 2009, certain MTS management emailed an executive at the same due diligence firm MTS had contracted with for due diligence on Shell Company B. The email requested the firm "initiate as quickly as possible an FCPA investigation of the following companies that are participants in [KOLORIT]." Certain MTS management, however, did not disclose certain relevant information to the due diligence firm, including the crucial fact that certain MTS management knew that Foreign Official would benefit from the transaction.

85. On or about August 7, 2009, certain MTS management received a memo from MTS's Department of Strategic Planning for the August 10, 2009 MTS Investment Committee meeting, recommending rejection of the KOLORIT acquisition because the acquisition was not part of MTS's "core business" and the estimate for advertising market development was "not realistic." The memo explained, "Within [the] framework of qualitative analysis, it's hard to imagine—within [the] framework of this poor country (171st rank in GDP — per capita (PPP) and 185th rank in inflation rate), just one outdoor local advertising company could cost 40 MUSD. This is a pure fairy tale!" Certain internal and external valuations of KOLORIT were significantly less than the recommended purchase price.

86. On or about August 14, 2009, certain MTS management received a report from the due diligence firm explaining that Uzbek corporate records indicated that Associate B and another individual were the shareholders of KOLORIT. The report further noted that Foreign Official and Associate B had various connections, but "[s]ources are unaware if [Associate B] represents the interests of [Foreign Official] at [KOLORIT]." Although certain MTS management received the report, which stated that rumors that KOLORIT might be beneficially owned by Foreign Official were not considered credible, certain MTS management in fact knew that Foreign Official was the beneficial owner of KOLORIT.

87. On or about September 16, 2009, Executive 1 presented the KOLORIT transaction to MTS's Board of Directors, which approved it. The Board materials for the meeting included the inflated valuation for KOLORIT and did not disclose that Foreign Official would benefit from the transaction.

88. On or about September 22, 2009, Uzdunrobita, through Executive 2, entered into share purchase agreements with the shareholders of KOLORIT. On or about that same day, September 22, 2009, Uzdunrobita, through Executive 2, and the shareholders of KOLORIT executed statements of transfer and acceptance of equity interest.

89. On or about September 22, 2009, Uzdunrobita paid the shareholders of KOLORIT a total of approximately $39,636,711 equivalent in Uzbek som.

90. On or about September 22, 2009, an MTS subsidiary entered into a share purchase agreement with a shareholder of KOLORIT, which was executed by certain MTS management.

91. On or about September 29, 2009, an MTS subsidiary transferred S17,000 to the Uzbek account of a shareholder in Uzbekistan, through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

92. As discussed in paragraph 53, on or about November 2, 2009, Executive 1 emailed himself a presentation including an updated copy of the slide referenced in paragraph 51. The slide stated that MTS's $50 million obligation had been "Paid in full in September 2009," including "through [KOLORIT] acquisition." The presentation also proposed "[t]o tie strictly further execution of our obligations with the partner's [*i.e.*, Foreign Official] ones." The presentation also noted problems with changing Uzdunrobita's management, specifically Executive 2, including that there was "[n]o full support from the country's political circles to the change of this kind yet unless the Partner [*i.e.*, Foreign Official] supports" and there would be "[n]o one able to deal with the acquired [KOLORIT]." It also noted that Uzdunrobita could lose its "existing currency exchange opportunities" and "the acquired frequencies," or even face the "[r]ecall of the license in some of the regions

**V. Corrupt Payment of $1.1 Million to Purported Charities and for Sponsorships in 2012**

93. In or around 2012, Foreign Official requested Uzdunrobita pay bribes in violation of U.S. law to entities related to Foreign Official as purported charitable donations or sponsorship payments. In response to these requests, between on or about March 27, 2012 and on or about May 21, 2012, Uzdunrobita paid the equivalent of approximately $1,139,137 in Uzbek som.

94. On or about March 27, 2012, Uzdunrobita paid at least the equivalent of $1,084,892.87 in Uzbek som to entities related to Foreign Official. The only basis for these payments was letters from entities related to Foreign Official that were sent to Uzdunrobita requesting contributions.

95. On or about March 29, 2012, Executive 2 sent Executive 1 a memorandum asking for approval from Uzdunrobita's Supervisory Board for 2 billion Uzbek som ($1,084,892.87) for payment for purported "charitable assistance" to various entities related to Foreign Official.

96. On or about April 24, 2012, Uzdunrobita sent a payment order to an entity related to Foreign Official for the equivalent of 100 million Uzbek som as a purported advance payment for sponsorship aid.

97. On or about May 21, 2012, Uzdunrobita received an invoice and a work completion act from the same entity related to Foreign Official identified in Paragraph 70 for 100 million in Uzbek som for purported "[s]ponsor support and organization of the 10th anniversary event" of the entity.

98. On or about June 27, 2012, Uzdunrobita's Supervisory Board retroactively approved the above purported charity payments, discussed above in paragraph 69.

99. Uzdunrobita made the above payments in violation of internal procedures that required preapproval of payments of those amounts.

**VI. Uzbekistan Expropriates Most of Uzdunrobita's Assets in 2012**

100. In or around the first half of 2012, Foreign Official became increasingly dissatisfied with MTS, Uzdunrobita, and Executive 2 because Uzdunrobita did not pay additional bribes for the benefit of Foreign Official. Consequently, Foreign Official began to threaten retaliation against the company.

101. On or about May 25, 2012, Executive 1 emailed certain MTS management that Foreign Official believed that "[Executive 2] and the company stopped being loyal to [Foreign Official] to the end." In or around June 2012, Associate B threatened to have Executive 2 and other Uzdunrobita executives arrested unless Foreign Official's bribe demands were met, In response, Executive 2 fled Uzbekistan on or about June 6, 2012.

102. Foreign Official's retaliation against MTS and Uzdunrobita continued. On or about August 13, 2012, an Uzbek court granted UzACI's petition to withdraw all operating licenses from

Uzdunrobita, which ended Uzdunrobita's ability to operate in the telecommunications sector in Uzbekistan. On or about August 27, 2012, Uzdunrobita's appeal of the decision was denied.

103. On or about August 29, 2012, MTS filed a Form 6-K with the SEC stating that it was taking a $579 million impairment charge of goodwill and assets in Uzbekistan as well as a $500 million provision for tax and anti-monopoly claims in Uzbekistan.

**VII. MTS's Failure to Implement and Enforce Adequate Internal Accounting Controls**

104. Throughout the relevant time period, because MTS failed to implement adequate internal accounting controls and failed to enforce the internal accounting controls it did have in place, it made the corrupt payments for the benefit of the Foreign Official.

105. MTS's lax internal control environment included a failure to require approval for certain transactions and a failure to comply with the established management approval requirements with respect to other transactions. The 2006 option amendment never was approved by MTS's Board of Directors. MTS's 2008 loan agreement with its foreign subsidiary to fund the payments to Shell Company B was approved by MTS's Board of Directors after the agreement with Shell Company B had been executed. And Uzdunrobita made the purported sponsorship and charity payments without approval of the Uzdunrobita Supervisory Board, which Uzdunrobita's internal procedures required.

106. MTS had inadequate disclosure controls and failed to follow established corporate governance procedures with respect to certain public statements made during the relevant period. For example, on or about June 13, 2012, a letter was sent from MTS addressed to the Prosecutor General's Office in Uzbekistan that stated that Executive 2 had made “inappropriate expenditures and plundered] the property belonging to the Company.” The letter further stated that MTS wished to “restore the normal working order in the company,” “rectify the faults” and “locate [Executive

2]," "including by seeking the assistance of INTERPOL." On or about June 25, 2012, MTS contradicted and retracted the June 13, 2012 letter, asserting that it had been "provided by [a] mistake caused by a technical malfunction and failure in the internal document workflow," when in fact there was no technical malfunction. Rather, MTS internal controls were not adequate to prevent the letter from being issued without proper review and authorization from the appropriate MTS management.

107. MTS also failed to follow established corporate governance protocols with respect to the role of the Board of Directors, including shareholder involvement, in certain aspects of its investment in Uzbekistan. For example, during the first quarter of 2007, Uzdunrobita's management acquired a 1.5% interest in an Uzbek company without obtaining the approval of the MTS Board of Directors. Similarly, as noted in paragraph 80, the June 13 and 25, 2012, letters were issued without the participation or knowledge of the Board of Directors.

108. MTS failed to implement an adequate system for conducting, recording, and verifying due diligence on third parties to uncover then-true nature, beneficial ownership, and possible corruption risks. MTS lacked procedures for the management of due diligence results. As demonstrated above, certain MTS management withheld crucial information from outside counsel and due diligence professionals such that the advice given was without value.

109. MTS also lacked adequate payment controls. For example, it made payments from entities other than entities that had executed contracts and had no policy regarding payments to bank accounts located in places where the contractual partner neither performed work nor had operations.

110. MTS also knowingly lacked a sufficient internal audit function to provide reasonable assurances that corporate assets were not used to pay bribes to foreign officials and failed to conduct adequate internal audits to detect and prevent criminal activity.

111. MTS's failures to implement and enforce adequate internal controls contributed to an environment where it was possible for MTS and Uzdunrobita executives to make improper payments of over $420 million for the benefit of Foreign Official between 2004 and 2012. MTS also had particularly severe deficiencies in its general compliance function and its anticorruption compliance policies and procedures. Among other deficiencies, prior to mid-2012, MTS did not have a Chief Compliance Officer or Compliance Department.

## VIII. Scheme to Falsify Books and Records

112. As a result of MTS's failure to implement effective internal accounting controls, MTS, acting through its executives and others, disguised on its books and records over $420 million in bribe payments in violation of U.S. law made for the benefit of Foreign Official in exchange for MTS's and Uzdunrobita's ability to enter and continue to operate in the Uzbek telecommunications sector.

113. In relation to the above-described payments, certain MTS management and others used a variety of non-transparent transactions with different false purported business purposes, described above, so that the payments would be inaccurately recorded in MTS's consolidated books and records as legitimate transactions.

114. The following payments were inaccurately recorded in MTS's consolidated books and records;

- A payment on or about July 29, 2004 for approximately $100 million to an escrow account for the benefit of Shell Company A in the United Kingdom.

- A payment on or about June 28, 2007 for approximately $250 million to Shell Company A's bank account in Hong Kong.
- A payment on or about October 21, 2008 for approximately $5 million to Shell Company B's bank account in Latvia.
- A payment on or about February 6, 2009 for approximately $5 million to Shell Company B's bank account in Hong Kong.
- A payment on or about March 5, 2009 for approximately $5 million to Shell Company B's bank account in Hong Kong.
- A payment on or about April 28, 2009 for approximately $5 million to Shell Company B's bank account in Hong Kong,
- A payment on or about June 17, 2009 for approximately $5 million to Shell Company B's bank account in Hong Kong.
- A payment on or about July 14, 2009 for approximately $5 million to Shell Company B's bank account in Hong Kong.
- Payments on or about September 22, 2009 for a total of approximately $39,636,711 equivalent in Uzbek som to the shareholders of KOLORIT.
- A payment on or about September 29, 2009 for approximately $17,000 to a shareholder of KOLORIT's account in Uzbekistan.
- Payments between in or around March 27, 2012 and or about May 21, 2012 for a total of approximately $1,084,892.87 in Uzbek som to entities related to Foreign Official.

115. MTS also created, and caused to be created, further false records to conceal these improper payments. The bribe payments were concealed by fake contracts that were intended to create the appearance of legitimacy and were falsely described in Board materials.

## IX. Defendants' False and Misleading Statements Prior to the Class Period

116. On July 17, 2013, the Wall Street Journal published an interview with Defendant Kornya. In the interview, Defendant Kornya was asked "How do you manage to avoid "brand contagion" from corruption in your markets--that is, what specific measures or organizational approaches do you use to enforce compliance?" In response, Defendant Kornya stated:

> ***First, we have very strong internal compliance related to FCPA [Foreign Corrupt Practices Act] and this type of issue. We have a chief compliance officer. We are very strict, very disciplined specifically given this perception toward our country as to how we control and behave in this environment.*** Secondly, when you talk about businesses such as MTS or other types of large businesses, they can do business without being exposed to this type of issue. We are privately owned, we have very limited interaction with the government, we are a large business, and in Russia you can run a business of that size without being exposed to this type of issue.

## X. MTS's Code of Code of Corporate Conduct and Business Ethics

117. On February 18, 2016, the MTS Board of Directors approved the Code of Corporate Conduct and Business Ethics. The Code of Corporate Conduct states, in relevant part:

> This Code of Corporate Conduct and Business Ethics (hereinafter, the "Code") contains the basic principles of business practice that are in place at Mobile TeleSystems Public Joint Stock Company (hereinafter, "MTS"). ***In its operations, MTS abides by applicable law and adheres to generally accepted standards of business ethics. The company does not tolerate any form of business practice running contrary to these rules.***
>
> The Code of Corporate Conduct and Business Ethics should be viewed as a document containing the minimal set of standards and requirements adopted in our company for the purpose of facilitating the pursuit of honest and ethical business practices and preventing improprieties. The Code sets out the rules and standards to which employees must adhere in their daily work. In such cases that demand compliance with higher standards than those commonly accepted in commercial practice, or that fall under a regulatory act of greater legal force pursuant to applicable law, MTS will adhere to such higher standards and apply the corresponding regulatory act.

* * *

The Code applies to members of the Board of Directors, senior management and all other MTS employees (hereinafter, the term "employees" shall be understood to mean all individuals to whom the Code applies). All employees must be thoroughly familiar with this Code and abide by the principles and procedures set forth herein. The standards of corporate conduct and business ethics presented in the Code also extend to all companies forming part of the MTS Group.

***Pursuant to the company's rules, behavior running contrary to statutes of the law or this Code may result in disciplinary action, including dismissal/termination of the respective employment agreement, based on the actual circumstances of each specific case and pursuant to applicable law.***

Employees who have violated the law or this Code must compensate MTS for material damage caused by such violations, in accordance with labour law and other applicable legislation, and pay civil damages. They may also be subject to administrative or criminal prosecution in accordance with applicable law. The company expects all of its employees to work honestly and conscientiously — this being a mandatory requirement of employment in the company.

* * *

While ***MTS has always strived to cooperate with government agencies in the performance of their official functions, including the holding of scheduled audits and investigations***, any MTS employee receiving an inquiry of any kind from a government agency in the course of such an audit or investigation must immediately contact the appropriate legal department.

* * *

The basic principles of MTS business practices contained in the Code adhere to the highest standards of business ethics. All employees bear responsibility for compliance with the Code and are personally responsible for their own actions.

Issues dealing with the violation of the Code, ethical conflicts, results of inspections conducted based on employees' reports of unethical behavior on the part of MTS employees (colleagues, managers, subordinates) are considered at meetings of the MTS PJSC Discipline Committee. In addition, such information is presented to the Audit Committee on a quarterly basis.

All employees must bear in mind that non-compliance with the mandatory requirements of the Code may result in financial losses and cause irreparable damage to the sterling reputation of the company and good standing MTS enjoys in the business community. In other words, the behavior of an employee in his / her capacity as MTS representative that fails to comply with applicable law or the Code may lead to serious consequences for the employee and company alike.

## XI. The Deferred Prosecution Agreement

118. On February 22, 2019, MTS and the DOJ entered into the DPA, which was publicly disclosed on March 6, 2019.

119. Under the terms of the DPA, MTS "admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate."

120. The DPA explains the calculations underlying the Total Monetary Penalty of $850 million paid by MTS. First, the Offense Level is determined by the United States Sentencing Guidelines ("USSG") § 2C1.1. Second, the Base Fine is determined by USSG §§ 8C2.4(b) and § 2C1.1(d)(1)(A). Third, the Culpability Score is determined by USSG § 8C2.5, and the Culpability Score is used to determine the minimum and maximum multipliers for the base fine under USSG § 8C2.6.

121. The Base Fine for MTS was $420,825,848, and the multipliers ranged from 1.6 (minimum) to 3.2 (maximum), creating a Fine Range of $673,321,357 to $1,346,642,714.

122. Due to the unique issues presented in FCPA matters, including their inherently international character and other factors, the FCPA Corporate Enforcement Policy is aimed at providing additional benefits to companies based on their corporate behavior once they learn of misconduct. To encourage good corporate behavior, the FCPA Corporate Enforcement Policy provides for a 50% reduction off of the low end of the USSG fine range for companies that voluntarily self-disclosed, fully cooperated, and timely and appropriately remediated. For companies that did not voluntarily disclose its misconduct to the DOJ, but later fully cooperated

and timely and appropriately remediated, the company will receive, or the Department will recommend to a sentencing court, up to a 25% reduction off of the low end of the USSG fine range. A 25% reduction from the low end of the Company's Fine Range would have resulted in a Total Monetary Penalty of around $505 million.

123. As the DPA explains, MTS neither fully cooperated nor appropriately remediated:

> pursuant to the FCPA Corporate Enforcement Policy, JM 9-47.120, because it significantly delayed production of certain relevant materials, refused to support interviews with current employees during certain periods of the investigation, and did not appropriately remediate, including by failing to take adequate disciplinary measures with respect to executives and other employees involved in the misconduct

124. Pursuant to the FCPA Corporate Enforcement Policy, one of the items required for a company to receive full credit for timely and appropriate remediation is the "appropriate discipline of employees, including those identified by the company as responsible for the misconduct, either through direct participation or failure in oversight, as well as those with supervisory authority over the area in which the criminal conduct occurred." In their respective roles as CEO and CFO, Defendants Dubovskov and Kornya both had supervisory authority over the criminal conduct admitted to in the DPA.

125. In contrast, the DOJ's deferred prosecution agreements with the two other multinational companies involved in the bribery scheme in Uzbekistan both received full remediation credit, in part, because they disciplined employees who were responsible for the misconduct or who failed in their responsibilities or oversight to prevent the misconduct. The deferred prosecution agreement between the DOJ and Telia credited Telia with fully remediating, in part, because "the Company engaged in extensive remedial measures, including terminating all individuals involved in the misconduct; terminating all individuals who had a supervisory role over those engaged in the misconduct, including every member of the Company's board who took

part in the decision to enter Uzbekistan, or failed to detect the corrupt conduct described in the attached Statement of Facts."[4] In similar contrast, the deferred prosecution agreement between the DOJ and VimpelCom credited VimpelCom with fully remediating, in part, because "the Company has engaged in extensive remediation, including terminating the employment of officers and employees when the Company determined that they were complicit in the unlawful payments or otherwise failed their responsibilities in connection with such payments."[5]

126. Additionally, the Company concedes in the DPA that it has "not yet fully implemented or tested its compliance program."

127. Given the Company's failure to fully cooperate with the investigation and to adequately remediate its internal controls and compliance, the DPA includes a Total Monetary Penalty 25% ***above*** the low end of the Fine Range. In contrast, Telia and VimpelCom's each received a 25% reduction from the low end of their respective fine ranges as a credit for their full cooperation and remediation.

128. If MTS had fully cooperated with the investigation and adequately remediated its internal controls, compliance code, policies, and procedures regarding compliance with anti-corruption laws—as Defendants falsely claimed throughout the Class Period—MTS would have been faced with a Total Monetary Penalty nearly $350 million less than the $850 million that MTS ended up paying.

**XII. The SEC Investigation**

129. On March 6, 2019—the same day that the DPA was disclosed—the SEC announced that MTS consented to an SEC order finding that it violated the anti-bribery, books and records

[4] https://www.justice.gov/usao-sdny/press-release/file/997851/download
[5] https://www.justice.gov/criminal-fraud/file/828301/download

and internal accounting control provisions of the Securities Exchange Act of 1934, and requiring it to pay a $100 million penalty[6]. The DOJ credited the $100 million penalty that MTS was required to pay to the SEC.

130. The SEC Consent Order cites numerous internal MTS documents and communications to supports its findings that (i) "MTS violated Exchange Act Section 30A by agreeing to make corrupt payments to a government official in Uzbekistan for the purpose of obtaining or retaining business" and (ii) "MTS also violated Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) by improperly recording the payments as legitimate expenses in its books and records and by failing to devise and maintain a reasonable system of internal accounting controls."

131. The SEC Consent Order explains that MTS filed financial statements with the SEC throughout 2004-2012 that improperly characterized illicit bribe payments as legitimate expenses. The SEC Consent Order states, in relevant part:

> From 2004 to at least 2012, MTS offered and paid bribes in violation of Section 30A of the Exchange Act, to a government official in Uzbekistan in connection with its Uzbek operations. The improper payments enabled MTS to enter the Uzbek market, to operate as a telecommunications provider, and to receive commercial benefits to its operations. Those benefits continued until 2012, when the Uzbek government expropriated MTS's Uzbek operations. During the course of the scheme, MTS made at least $420 million in illicit payments for the purpose of obtaining and retaining business, and those payments generated more than $2.4 billion in revenues. These illicit payments were made through a variety of means, including equity transactions with the government official, sham contracts, and in the form of charitable contributions or sponsorships at the direction of the government official. ***These payments were improperly characterized as legitimate expenses in MTS's books and records. MTS filed its financial statements, incorporating the falsely recorded payments, with the Commission throughout the relevant period.***

---

[6] "Order Instituting Cease-And-Desist Proceedings, Pursuant To Section 21c Of The Securities Exchange Act Of 1934, Making Findings, And Imposing Remedial Sanctions And A Cease-And-Desist Order" (the "SEC Consent Order") is annexed hereto as Exhibit 4 and incorporated by reference herein.

132. As the Company's CFO and/or Acting CFO, Defendant Kornya signed certifications pursuant to the Sarbanes-Oxley Act of 2002 attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud for at least four of those false and misleading financial statements described by the SEC Consent Order: the Company's Form 20-F filed on May 26, 2009; the Company's Form 20-F filed on June 28, 2010; the Company's Form 20-F filed on June 17, 2011; and the Company's Form 20-F filed on April 23, 2012.

133. As the Company's CEO, Defendant Dubovskov signed certifications pursuant to the Sarbanes-Oxley Act of 2002 attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud for at least two of those false and misleading financial statements described by the SEC Consent Order: the Company's Form 20-F filed on June 17, 2011, and the Company's Form 20-F filed on April 23, 2012.

## XIII. Accounting Principles Imposed a Duty to Disclose the Potential Financial Impact on MTS of the SEC and DOJ Investigation

134. The Company's financial statements violated U.S. Generally Accepted Accounting Principles ("GAAP") and International Financial Reporting Standards ("IFRS") for failing to recognize a reasonably estimable probable loss from a loss contingency, or alternatively, to at least disclose that such loss was reasonably possible, its nature, and the amount or range of such loss, in the minimum amount of the amount of the bribes paid to government officials. Under USSG §§ 8C2.4(b) and § 2C1.1(d)(1)(A), the minimum base fine MTS faced for its corrupt bribery was the "greatest of: (A) the value of the unlawful payment; (B) the value of the benefit received or to be received in return for the unlawful payment; or (C) the consequential damages resulting from the unlawful payment." The value of the unlawful payments was easily calculable by MTS and should

have been disclosed as a contingent liability, if not recognized as an accrued loss contingency or provision.

135. The Company prepared its audited consolidated financial statements in accordance with U.S. GAAP prior to fiscal 2015, at which point the Company adopted IFRS".

136. GAAP and IFRS are the common set of accounting principles, standards, and procedures that companies in the United States and internationally use to compile their financial statements.

137. SEC and NYSE rules and regulations require that publicly traded companies such as MTS include financial statements that comply with GAAP or IFRS in their annual and quarterly reports filed with the SEC. See Sections 12 and 13 of the Exchange Act; Rule 10-01(d) of Regulation SX.

138. SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1) (emphasis added).

139. Under GAAP, a contingent liability or loss contingency is "an existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur." Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 5, Accounting for Contingencies ¶ 1 (1975) (FAS 5); ASC 450-20-20. (FAS 5 was codified as ASC 450, Contingencies, in the FASB Accounting Standards Codification, which became the official single source of authoritative nongovernmental GAAP on July 1, 2009, and was effective for interim and annual periods ending after September 15, 2009. Hereinafter, FAS 5 is referred to as ASC 450.)

140. When a loss contingency exists, the likelihood that the future event or events will confirm the loss or impairment of an asset or the incurrence of a liability can range from probable to remote. ASC 450 “uses the terms probable, reasonably possible, and remote to identify three areas within that range, as follows:

a. Probable. The future event or events are likely to occur.

b. Reasonably possible. The chance of the future event or events occurring is more than remote but less than likely.

c. Remote. The chance of the future event or events occurring is slight.

ASC 450-20-20.

141. Examples of loss contingencies include pending or threatened litigation, and actual or possible claims and assessments. ASC 450-20-05-10. Actual or possible claims and assessments include those imposed by governmental entities.

142. Under ASC 450-20-25-2, an accrual of an estimated loss contingency through a charge against earnings is required if (i) it is probable that an asset has been impaired or a liability has been incurred as of the date of the financial statements and (ii) the amount of the loss can be reasonably estimated. Under ASC 450, “probable” means more likely than not to occur.

143. Under ASC 450, “if some amount within a range of loss appears at the time to be a better estimate than any other amount within the range, that amount shall be accrued. When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued.” Disclosure of an additional amount of exposure to loss is required if there is a reasonable possibility that the additional loss will be incurred. ASC 450-20-30-1; ASC 450-20-50-3b. Loss contingencies that do not meet both criteria for recognition (i.e., probable and estimable) still may need to be disclosed in the financial statements. ASC 450.

144. ASC 450 requires the issuer to disclose a loss contingency if there is at least a reasonable possibility that a loss may have been incurred (i.e., the possibility of a loss is more than "remote"). ASC 450-20-50-3.

145. Where the loss contingency is less than probable, but not remote, the disclosure shall include "the nature of the contingency" and "an estimate of the possible loss or range of loss or a statement that such an estimate cannot be made." ASC 450-20-50-4.

146. "Disclosure is not required of a loss contingency involving an unasserted claim or assessment if there has been no manifestation by a potential claimant of an awareness of a possible claim or assessment unless both of the following conditions are met: a. It is considered probable that a claim will be asserted. b. There is a reasonable possibility that the outcome will be unfavorable." ASC 450-20-50-6.

147. Consequently, where a governmental agency manifests an awareness of a reasonably possible and material claim against a company, that company must disclose in the financial statements "the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made." ASC450-20-50-6.

148. The disclosure requirements under IFRS, which are codified under IAS 37, are very similar to the requirement under ASC 450. Under IAS 27, A provision shall be recognized when: (i) an entity has a present obligation (legal or constructive) as a result of a past event; (ii) it is probable that an outflow of resources embodying economic benefit will be required to settle the obligation; and (iii) a reliable estimate can be made of the amount of the obligation. The Company recognized these standards; for example, the Company's Form 20-F filed with the SEC on April 27, 2018 acknowledges the requirements of IAS 27:

> **Provisions**—Provisions are recognized when the Group has a present obligation (legal or constructive) as a result of past event, it is probable that the Group will be

> required to settle that obligation and a reliable estimate can be made of the amount of the obligation. Provisions are measured at managements' best estimate of the expenditure required to settle the obligation at the reporting date and are discounted to present value where the effect is material. The main provisions the Group holds are in relation to employees' bonuses and other rewards, decommissioning and restoration obligation, tax provisions as well as legal claims.

149. IAS 37 recognizes that estimating obligations for provisions is more uncertain than most other items in a financial statement. Still, IAS 37-25 states that it is "extremely rare" for a company to be unable to estimate a range of possible outcomes that is sufficiently reliable:

> The use of estimates is an essential part of the preparation of financial statements and does not undermine their reliability. This is especially true in the case of provisions, which by their nature are more uncertain than most other items in the statement of financial position. Except in extremely rare cases, an entity will be able to determine a range of possible outcomes and can therefore make an estimate of the obligation that is sufficiently reliable to use in recognising a provision.

150. Under IAS 37-39, the amount accrued should be either the best estimate of the obligation or, if there is no best estimate, the midpoint of a range.

151. The SEC considers the disclosure of loss contingencies of such importance to an informed investment decision that it issued Article 10-01 of Regulation S-X [17 C.F.R. 210.10-01], which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, except that "where material contingencies exist, the disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

152. Because (i) Defendants were aware at all times that MTS had violated the FCPA, and (ii) it was probable that its violations would result in a material loss to MTS, and (iii) Defendants knew to the dollar the amount of corrupt bribes the Company had paid in violation of the FCPA, and (iv) could thus reasonably estimate the amount of that loss as soon as the DOJ and SEC had manifested an awareness of a possible claim against MTS as part of its investigation.

Defendants were obligated under ASC 450/IAS 37 to record a contingent liability on MTS's balance sheet, and a charge to income on the income statement, in the minimum amount of the value of the corrupt payments.

153. Alternatively, for each quarterly and annual reporting period from March if the loss wasn't probable, it was certainly reasonably possible, and thus Defendants violated GAAP by failing to disclose in its financial statements a loss contingency arising from the Government's having communicated to Defendants its awareness of possible material FCPA related claims against MTS.

154. Alternatively, for each quarterly and annual reporting period from November 18, 2011 through May 2, 2016, if the loss was not probable, it was certainly reasonably possible, and thus Defendants also violated GAAP by failing to give an estimate of the amount of possible loss or range of loss in its financial statements thereby depriving investors of the material fact that should the loss occur, MTS would at a minimum pay hundreds of millions of dollars as a result of FCPA violations related to the Investigation.

155. The Company recognized a provision for the DOJ and SEC investigations for the first time in its Q3 2018 financial statement, filed under Form 6-K with the SEC on November 20, 2018. Prior to recognizing the provision, each quarterly and annual financial statement issued by the Company during the Class Period violated applicable accounting standards by not recognizing an accrual or provision for the DOJ and SEC investigations.

156. Knowing that the SEC and DOJ had manifested the awareness of a potential material claim against MTS when they notified MTS of the investigation by March 19, 2014, ASC 450 and IAS 37 required that Defendants undertake a reasonable investigation to determine the

likelihood that the DOJ's potential FCPA claim related to their Uzdunrobita investment, would result in a material loss to MTS.

157. If not already aware, Defendants Dubobskov and Kornya would, in the course of their mandatory ASC 450/IAS 37 inquiry, learned that MTS had violated the FCPA in bribing Uzbek officials.

158. First, Defendants were aware at all relevant times that the Company violated the FCPA, that the SEC and DOJ were investigating the Company's FCPA violations, and that the Company would more likely than not face penalties for its violations. The evidence that the Company knew it would probably incur a financial obligation for its FCPA violation is voluminous:

- Defendant Dubovskov was President and CEO from 2011 to 2012, while MTS continued making corrupt payments in violation of the FCPA. Dubovskov also served on the Company's Management Board beginning in 2008.
- Defendant Kornya was the Company's CFO for several years during the bribery scheme.
- Upon information and belief, Executive 1 listed in the DPA and in the Information and DPA was Oleg Y. Raspopov, who oversaw the bribery scheme. MTS listed Raspopov in its annual reports as serving as its Vice President—Director of MTS Foreign Subsidiaries Business Unit since May 2007. As such, Raspopov was a high-ranking executive officer of MTS and his knowledge is imputed to MTS. Further, Kornya and Dubovskov both served on the Management Board with Raspopov from 2008 to 2013.
- Uzbekistan's 2012 expropriation of the Company's Uzbeki subsidiary led to MTS taking a $1.1 billion write-off, the Company filing a legal claim for compensation,

protracted litigation, and a settlement. It is implausible the Company did not investigate the causes of the expropriation during the pendency of this proceeding or during settlement negotiations—particularly since MTS attempted to reenter the Uzbekistan market in 2014 following the settlement.

- On March 18, 2014, the same day that MTS first disclosed that the SEC had opened an investigation into MTS's activities in Uzbekistan, Reuters reported that "[i]nternational scrutiny of Uzbekistan has been growing, with the SEC investigating the operations of MTS's rival Vimpelcom and Sweden's TeliaSonera in the central Asian state. Swedish, Dutch and Swiss authorities are investigating alleged bribery and money laundering. The Swiss are also looking into Gulnara Karimova, the daughter of Uzbekistan's president."
- On March 22, 2015, the Organized Crime and Corruption Reporting Project ("OCCRP") reported that it had obtained financial documents detailing "that Karimova squeezed more than US$ 1 billion worth of payments and ownership shares out of international telecom-related companies. TeliaSonera paid US$ 381 million and promised an additional US$ 75 million; VimpelCom and its Russian mother company Alfa Telecom paid US$ 176 million; the Russian giant MTS paid US$ 350 million." OCCRP detailed the $100 million payment to purchase a majority stake in Uzdunrobita in 2004 and the $250 million payment to purchase the remaining 26% stake in Uzdunrobita in 2007.
- On April 1, 2015, OCCRP reported that the DOJ had asked Swedish authorities to freeze US$ 30.4 million in assets controlled by Gulnara Karimova. OCCRP posted a copy of the request, which stated "The Facts, Offenses, and Persons and Entities

Involved, as provided in the September 27, 2013, original request, the December 19, 2013, supplemental request, and the August 27, 2014, second supplemental request, are incorporated by reference herein. As explained in the previous requests, the U.S. investigation has revealed that Vimpelcom, MTS, and TeliaSonera paid bribes to Uzbek officials to obtain mobile telecommunications business in Uzbekistan and that funds involved in the scheme were laundered through shell companies and financial accounts around the world, including accounts held in Sweden, to conceal the true nature of these illegal payments."[7]

- On June 29, 2015 the DOJ filed a verified complaint in the Southern District of New York, an in rem to forfeit approximately $300 million in assets, and any property traceable thereto, involved in an international conspiracy to launder corrupt payments made to Karimova. The complaint detailed hundreds of millions of dollars of corrupt payments by MTS to Karimova, laundered through various companies.[8] The complaint stated that the forfeiture sought was proceeds traceable to a violation of the FCPA and identified MTS as "an 'issuer,' as that term is defined in the FCPA." On August 14, 2015, the Wall Street Journal reported that US prosecutors believe Amsterdam-based Vimpelcom Ltd, Russia-based Mobile TeleSystems PJSC, and Sweden's TeliaSonera AB paid hundreds of millions of dollars to firms controlled by Karimova in return for telecoms licenses and deals.

[7] A copy of the DOJ's Third Supplemental Request for Assistance in the Investigation of VimpelCom, Ltd. ("VimpelCom"), Mobile TeleSystems OJSC ("MTS"), and TeliaSonera AB ("TeliaSonera") is annexed hereto as Exhibit 5 and incorporated by reference herein

[8] A copy of the DOJ's Verified Complaint, filed on June 29, 2015, is annexed hereto as Exhibit 6 and incorporated by reference herein

- On February 18, 2016, the DOJ filed another verified complaint in the SDNY providing even more detail into the Company's FCPA violations. The complaint detailed over $380 million in "corrupt payments" made by MTS through eight different transaction, identifying the date, originating party, originating bank, beneficial party, beneficial bank, and amount for each transaction.[9] That same day, VimpelCom entered into resolutions with the DOJ in which it admitted to a conspiracy to make more than $114 million in bribery payments to a government official in Uzbekistan between 2006 and 2012 to enable them to enter and continue operating in the Uzbek telecommunications market.
- The criminal Information and DPA were based on internal company documents produced to the DOJ that the Company carefully reviewed prior to providing them to the DOJ. The Company knew that these documents proved the Company's violations of the FCPA.

159. Debevoise & Plimpton LLP conducted an internal investigation of the Company's corrupt payments, and the Company produced summaries of the investigation to the DOJ. Debevoise also represented the Company in its legal action against Uzbekistan seeking compensation for the 2012 expropriation. It is implausible that a large, highly competent law firm would have been unable to uncover the Company's corrupt payments.

160. Second, the Company was capable of reasonably estimating its obligation or a range of obligations:

[9] A copy of the DOJ's Verified Complaint, filed on February 18, 2016, is annexed hereto as Exhibit 7 and incorporated by reference herein

- Financial penalties for FCPA violations are formulaic and predictable. According to the DOJ/SEC Resource Guide to the US Foreign Corrupt Practices Act, "When calculating penalties for violations of the FCPA, DOJ focuses its analysis on the U.S. Sentencing Guidelines (Guidelines) in all of its resolutions, including guilty pleas, DPAs, and NPAs. The Guidelines provide a very detailed and predictable structure for calculating penalties for all federal crimes, including violations of the FCPA."[10]
- The Company knew the scope of the bribery, at the very latest, when public reports began being published in March 2015. Alternatively, the Company was certainly aware of the minimum amount of corrupt payments it had made when those payments were detailed in the DOJ's Verified Complaints.

161. Defendants also acted with scienter in that they knew, or recklessly disregarded, that the Company's annual and quarterly reports filed with the SEC during the Class Period were materially false and misleading in the absence of the disclosures required by ASC 450 and IAS 37.

**Materially False and Misleading Statements**

162. On March 19, 2014, the Company disclosed that "the United States Department of Justice [("DOJ")] also is conducting a parallel investigation . . . related to [Mobile's] former operations in Uzbekistan . . . [which] concerned [Mobile] and not merely the activities of unaffiliated parties."

163. On April 24, 2014, the Company filed a Form 20-F with the SEC, which provided its financial results and position for the fiscal year ended December 31, 2013 (the "2013 20-F"). The 2013 20-F was signed by Defendant Dubovskov. The 2013 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Dubovskov and

[10] https://www.sec.gov/spotlight/fcpa/fcpa-resource-guide.pdf

Kornya attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

164. The 2013 20-F gave the misleading impression that the Company would not be able to predict the outcome of the U.S. government's investigations into its Uzbekistan operations, including potential fines or penalties. The 2013 20-F stated, in relevant part:

> ***Investigations into former operations in Uzbekistan***—In March 2014, the Group received requests for the provision of information from the United States Securities and Exchange Commission and the United States Department of Justice relating to an investigation of the Group's former subsidiary in Uzbekistan (Note 4). As the aforementioned US government investigations are at an early stage, the Company cannot predict the outcome of the investigations, including any fines or penalties that may be imposed, and such fines or penalties could be significant.

165. The 2013 20-F also described the Company's Code of Ethics and directed investors to review the Code of Ethics on the Company's website. The 2013 20-F stated, in relevant part:

> The current version of our Code of Ethics was adopted on February 13, 2014. Our Code of Ethics applies to all of our officers, directors and employees. The new Code of Ethics did not substantively alter any of its requirements as compared with the code of ethics that was in effect prior to the approval of the new Code of Ethics. A copy of our Code of Ethics is available on our website at www.mtsgsm.com.

166. On or around June 24, 2014, the Company approved its 2013 Annual Report and posted it on its website. The 2013 Annual Report was sent to shareholders with a cover letter from Defendant Dubovskov. The 2013 Annual Report stated that the Company's compliance with its Code of Business Conduct and Ethics helps to protect the Company's good name and maintain the Company's competitive advantage. The 2013 Annual Report stated, in relevant part:

> Code of Business Conduct and Ethics (hereinafter the Code) contains the basic business principles of Mobile TeleSystems OJSC. ***In its activities MTS complies with legislation and generally accepted standards of business ethics.*** **The Company does not accept any other ways of doing business that are contrary to these rules.**
>
> The Code should be regarded as a document containing a minimum set of standards and requirements adopted by the Company in order to promote fair and ethical

> business practices and to prevent abuse. The Code defines the rules and standards that should be followed by employees in their everyday work. In cases requiring application of higher standards than the accepted commercial practice, or regulations having greater legal force under the current legislation, MTS will use such higher standards.
>
> The Code applies to members of the Board of Directors, senior management and other employees of the Company.
>
> All employees are responsible for compliance with the Code and are personally responsible for their actions.
>
> **The Code is a fundamental document, which guides us in our daily work and helps us to protect the good name of our Company and *maintain our competitive advantage*.**

167. The 2013 Annual Report also touted the Company's corporate compliance system, including the Company's commitment to compliance with the FCPA and its zero-tolerance policy towards corruption. The 2013 Annual Report stated, in relevant part:

> The company is committed to compliance with anti-corruption laws (anti-corruption laws of the countries in which the Company operates, Foreign Corrupt Practices Act 1977, The Bribery Act 2010) and ethical business conduct in all kinds of business relationships, regardless of the country where the Company conducts its economic activities. The Company has established the principle of zero tolerance to corruption in all forms and manifestations, both in daily activities and in implementation of strategic projects.
>
> The main documents regulating compliance procedures within MTS are the Code of Business Conduct and Ethics and the Policy "Compliance with anti-corruption laws." In addition, procedures to ensure compliance with anti-corruption laws are contained in regulations of business processes of the Company.

168. On May 27, 2014, the Company filed a Form 6-K with the SEC, which provided its financial results and position for the fiscal quarter ended March 31, 2014 (the "2014 Q1 6-K"). The 2014 Q1 6-K was signed by Defendant Dubovskov. The 2014 Q1 6-K violated GAAP because it does not contain any accrued liability related to the DOJ or SEC investigations into the Company's corrupt bribery scheme in Uzbekistan. Nor did it adequately disclose the Company is

subject to prosecution for serious FCPA violations and is subject to potential monetary liability of , at the very least, the amount of its corrupt payments as required by ASC 450.

169. On August 20, 2014, the Company filed a Form 6-K with the SEC, which provided its financial results and position for the fiscal quarter ended June 30, 2014 (the "2014 Q2 6-K"). The 2014 Q2 6-K was signed by Defendant Dubovskov. The 2014 Q2 6-K violated GAAP because it does not contain any accrued liability related to the DOJ or SEC investigations into the Company's corrupt bribery scheme in Uzbekistan. Nor did it disclose the Company is subject to prosecution for serious FCPA violations and is subject to potential monetary liability of, at the very least, the amount of its corrupt payments as required by ASC 450.

170. The 2014 Q2 6-K also directed investors to visit the Company's website for "full disclosure materials." Simultaneously, the Company posted its Unaudited Condensed Consolidated Interim Financial Statements As of June 30, 2014 and December 31, 2013 and for the Six Months Ended June 30, 2014 and 2013 (the "2014 Interim Financial Statements") to its website. The 2014 Interim Financial Statements did not contain any accrued liability related to the DOJ or SEC investigations into the Company's corrupt bribery scheme in Uzbekistan, nor does it even disclose the investigations and potential financial liability. Instead, the Commitments and Contingencies section of the 2014 Interim Financial Statements states, in relevant part:

> Other litigation – In the ordinary course of business, the Group is a party to various legal, tax and customs proceedings, and subject to claims, certain of which relate to developing markets and evolving fiscal and regulatory environments in which MTS operates. ***Management believes that the Group's liability, if any, in all such pending litigation, other legal proceedings or other matters will not have a material effect upon its financial condition, results of operations or liquidity of the Group.***

171. On November 25, 2014, the Company filed a Form 6-K with the SEC, which provided its financial results and position for the fiscal quarter ended September 30, 2014 (the

"2014 Q3 6-K"). The 2014 Q3 6-K was signed by Defendant Dubovskov. The 2014 Q3 6-K violated GAAP because it did not contain any accrued liability related to the DOJ or SEC investigations into the Company's corrupt bribery scheme in Uzbekistan. Nor did it adequately disclose the Company is subject to prosecution for serious FCPA violations and is subject to potential monetary liability of, at the very least, the amount of its corrupt payments as required by ASC 450.

172. On April 21, 2015, the Company filed a Form 20-F with the SEC, which provided its financial results and position for the fiscal year ended December 31, 2014 (the "2014 20-F"). The 2014 20-F was signed by Defendant Dubovskov. The 2014 20-F contained signed SOX certifications by Defendants Dubovskov and Kornya attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

173. The 2014 20-F gave the misleading impression that the Company would not be able to predict the outcome of the U.S. government's investigations into its Uzbekistan operations, including potential fines or penalties. The 2014 20-F stated, in relevant part:

> ***Investigations into former operations in Uzbekistan***—In March 2014, the Group received requests for the provision of information from the United States Securities and Exchange Commission and the United States Department of Justice relating to an investigation of the Group's former subsidiary in Uzbekistan (Note 4). The Company cannot predict the outcome of the investigations, including any fines or penalties that may be imposed, and such fines or penalties could be significant.

174. On or around June 24, 2015, the Company approved its 2014 Annual Report and posted it on its website. The 2014 Annual Report was sent to shareholders with a cover letter from Defendant Dubovskov. The 2014 Annual Report stated that the Company's compliance with its Code of Business Conduct and Ethics helps to protect the Company's good name and maintain the Company's competitive advantage. The 2014 Annual Report stated, in relevant part

> The leading position of our Company in the market is largely determined by the size and scope of its activities, dynamic development and continuous differentiation of products and services for subscribers. Today, however, it takes more than just seeking to improve investment and operating efficiency to be a successful company. Prominence of our Company obliges us to support its reputation in a best possible way. With each new achievement our responsibility to all stakeholders and the public increases. Code of Business Conduct and Ethics (hereinafter, the Code) contains the basic business principles of Mobile TeleSystems OJSC. In its activities, MTS complies with legislation and generally accepted standards of business ethics. The Company does not accept any other ways of doing business that are contrary to these rules. The Code should be regarded as a document containing a minimum set of standards and requirements adopted by the Company in order to promote fair and ethical business practices and to prevent abuse. The Code defines the rules and standards that should be followed by the employees in their everyday work. In cases requiring application of higher standards than the accepted commercial practice, or regulations having greater legal force under the current legislation, MTS will use such higher standards. The Code applies to the members of the Board of Directors, senior management and other employees of the Company. All employees are responsible for compliance with the Code and are personally responsible for their actions. The Code is a fundamental document, which guides us in our daily work and helps us to protect the good name of our Company and maintain our competitive advantage.

175. The 2014 Annual Report also touted the Company's corporate compliance system, including the Company's commitment to compliance with the FCPA and its zero-tolerance policy towards corruption. The 2014 Annual Report stated, in relevant part:

> Holding leading positions in the industry, the Company is aware of its high responsibility for transparency, ethics and legality of business. In order to maintain and preserve it high business reputation before the state, shareholders, customers, partners, competitors and the society as a whole, the Company has been actively developing for several years a corporate system of compliance with the requirements of the applicable laws and ethical business practices ("compliance system").
>
> The company is committed to the principles of compliance with anti-corruption laws (anticorruption laws of the countries where the Company operates, Foreign Corrupt Practices Act 1977, The Bribery Act 2010) and ethical business conduct in all kinds of business relationships, regardless of the country where the Company conducts its economic activities. The Company has established the principle of zero tolerance to corruption in all forms and manifestations, both in daily activities and in implementation of strategic projects.
>
> The main documents regulating compliance procedures in MTS include the Code of Business Conduct and Ethics, the Policy Compliance with Anti-Corruption Laws, and the Policy Management of the Conflict of Interests. In addition, the procedures to ensure

compliance with anticorruption laws are contained in the regulations on the Company's business processes.

176. On May 19, 2015, the Company filed a Form 6-K with the SEC, which provided its financial results and position for the fiscal quarter ended March 31, 2015 (the "2015 Q1 6-K"). The 2015 Q1 6-K was signed by Defendant Dubovskov. The 2015 Q1 6-K violated IFRS because it did not contain any provision or estimated potential liability related to the DOJ or SEC investigations into the Company's corrupt bribery scheme in Uzbekistan. Nor did it adequately disclose the Company is subject to prosecution for serious FCPA violations and is subject to potential monetary liability of, at the very least, the amount of its corrupt payments as required by IAS 37.

177. On August 18, 2015, the Company filed a Form 6-K with the SEC, which provided its financial results and position for the fiscal quarter ended June 30, 2015 (the "2015 Q2 6-K"). The 2015 Q2 6-K was signed by Defendant Dubovskov. The 2015 Q2 6-K did not contain any provision or estimated potential liability related to the DOJ or SEC investigations into the Company's corrupt bribery scheme in Uzbekistan. The 2015 Q2 6-K falsely stated that the Company was cooperating with the SEC and DOJ investigations in good faith:

> MTS affirms that the alleged activities related to MTS's business in Uzbekistan have been referenced in a civil forfeiture complaint, filed by US Department of Justice (DOJ) in the U.S. District Court, Southern District of New York (Manhattan), directed at certain assets of an unnamed Uzbek government official. The Complaint alleges among other things that MTS and certain other parties made corrupt payments to the unnamed Uzbek official to assist their entrance and operations in the Uzbekistan telecommunications market. The Complaint is solely directed towards assets held by the unnamed Uzbek official, and none of MTS's assets are affected by the Complaint.
>
> As MTS disclosed in March 2014, both the US Securities and Exchange Commission (SEC) and DOJ are currently conducting an investigation related to MTS's former operations in Uzbekistan. As previously disclosed, the Company has received requests for documents and information from both the SEC and DOJ and continues to cooperate with these investigations in good faith.

178. On November 17, 2015, the Company filed a Form 6-K with the SEC, which provided its financial results and position for the fiscal quarter ended September 30, 2015 (the "2015 Q3 6-K"). The 2015 Q3 6-K was signed by Defendant Dubovskov. The 2015 Q3 6-K did not contain any provision or estimated potential liability related to the DOJ or SEC investigations into the Company's corrupt bribery scheme in Uzbekistan. The 2015 Q3 6-K gave the misleading impression that the Company would not be able to predict the outcome of the U.S. government's investigations into its Uzbekistan operations, including potential fines or penalties, and that the Company was cooperating with the investigations, stating in relevant part:

> MTS announces that as the Company had previously disclosed, the US Department of Justice (DOJ) and the SEC are conducting an investigation into MTS's business activities in Uzbekistan. In addition, MTS publicly confirmed that it had been referenced in a civil forfeiture complaint, filed by the DOJ, directed at certain assets of an unnamed Uzbek government official. The complaint alleges that MTS made corrupt payments to gain access to the Uzbek telecommunications market. The Complaint alleges among other things that MTS and certain other parties made corrupt payments to the unnamed Uzbek official to assist MTS entering and operating in the Uzbekistan telecommunications market. The Complaint is solely directed towards assets held by the unnamed Uzbek official, and none of MTS's assets are affected by the Complaint.
>
> MTS has made no provision in relation to the investigation conducted by the US Department of Justice and the SEC regarding MTS's business activities in Uzbekistan. In accordance with IAS 37 Provisions, Contingent Liabilities and Contingent Assets, a provision should be recognized when a legal or constructive obligation exists and such an obligation can be reliably estimated. MTS continues to cooperate with the authorities. At the current stage of the investigations, MTS has no reliable basis to predict any outcome.

179. The 2015 Q3 6-K violated IAS 37 because it did not record a liability for MTS's FCPA violations even though it was probable MTS would incur an FCPA related liability. Even if a liability was not probable, it was certainly possible, and MTS could have easily estimated it potential liability under the FCPA as required by IAS 37. Failure to do so violated IAS 37.

180. On April 20, 2016, the Company filed a Form 20-F with the SEC, which provided its financial results and position for the fiscal year ended December 31, 2015 (the "2015 20-F"). The 2015 20-F was signed by Defendant Dubovskov. The 2015 20-F contained signed SOX certifications by Defendants Dubovskov and Kornya attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

181. The 2015 20-F gave the misleading impression that the Company would not be able to predict the outcome of the U.S. government's investigations into its Uzbekistan operations, including potential fines or penalties, and that the Company was cooperating with the investigations. The 2015 20-F stated, in relevant part:

> ***Investigations into former operations in Uzbekistan***—In March 2014, the Group received requests for the provision of information from the United States Securities and Exchange Commission ("SEC") and the United States Department of Justice ("DOJ") relating to a currently conducted investigation of the Group's former subsidiary in Uzbekistan.
>
> In July 2015, activities related to the Group's former operations in Uzbekistan have been referenced in a civil forfeiture complaint ("The Complaint"), filed by DOJ in the U.S. District Court, Southern District of New York (Manhattan), directed at certain assets of an unnamed Uzbek government official. The Complaint alleges among other things that MTS and certain other parties made corrupt payments to the unnamed Uzbek official to assist their entering and operating in the Uzbekistan telecommunications market. The Complaint is solely directed towards assets held by the unnamed Uzbek official, and none of MTS's assets are affected by the Complaint.
>
> ***The Company continues to cooperate with these investigations.*** The Company cannot predict the outcome of the investigations, including any fines or penalties that may be imposed, and such fines or penalties could be significant.

182. MTS's 2015 20-F violated IAS 37 because it did not record a liability for MTS's FCPA violations even though it was probable MTS would incur an FCPA related liability. Even

if a liability was not probable, it was certainly possible, and MTS could have easily estimated its potential liability under the FCPA as required by IAS 37. Failure to do so violated IAS 37.

183. On May 19, 2016, the Company filed a Form 6-K with the SEC, which provided its financial results and position for the fiscal quarter ended March 31, 2016 (the "2016 Q1 6-K"). The 2016 Q1 6-K was signed by Defendant Dubovskov. The 2016 Q1 6-K did not contain any provision or estimated potential liability related to the DOJ or SEC investigations into the Company's corrupt bribery scheme in Uzbekistan. The 2016 Q1 6K violated IAS 37 because it did not record a liability for MTS's FCPA violations even though it was probable MTS would incur an FCPA related liability. Even if a liability was not probable, it was certainly possible, and MTS could have easily estimated its potential liability under the FCPA as required by IAS 37. Failure to do so violated IAS 37.

184. On or around June 24, 2016, the Company approved its 2015 Annual Report and posted it on its website. The 2015 Annual Report was sent to shareholders with a cover letter from Defendant Dubovskov. In the 2015 Annual Report, the Company claimed that MTS had been providing DOJ and SEC investigators with information "upon request" and answers "on demand." The 2015 Annual Report stated, in relevant part:

> In March 2014, MTS PJSC received a request for information from the US Securities and Exchange Commission and the US Department of Justice regarding the investigation of the former subsidiary in Uzbekistan. MTS PJSC is cooperating with the above-mentioned organisations: it provided the information upon request and continues to provide answers on demand. Since the investigation has not been completed, there is no way to predict its outcome, including the possible imposition of fines and penalties which could be significant.

185. The 2015 Annual Report also touted the Company's compliance with anti-corruption requirements, stating in relevant part:

> The Company adheres to principles of compliance with requirements of applicable anti-corruption legislation (anti-corruption legislation of countries, on the territory

of which the Company performs its activities, Foreign Corrupt Practices Act 1977, The Bribery Act 2010) and business ethics in all business relations and irrespective of a world country, in which the Company performs its business activities.

The Company fixed the principle of non-acceptance of corruption in any forms and occurrences both in everyday activities and when implementing strategic projects. Main documents governing compliance of the procedure inside MTS are the Code of Business Conduct and Ethics, Compliance with anti-corruption legislation Policy, Conflict of interests management Policy. Besides, procedures for assuring compliance with anti-corruption legislation are fixed in regulations of Company's business-processes.

The compliance system in MTS PJSC sets forth measures aimed at regulatory risk management, improving corporate culture of the Company, implementing and developing in the Company best corporate governance practices as well as standards of responsible business conduct relying on norms of applicable legislation, recommendations of regulatory bodies, industrial specifics and best practices in this area.

186. The 2015 Annual Report described how the Company's Code of Business Conduct and Ethics was essential to the Company's success. The 2015 Annual Report stated, in relevant part:

**Conduct of business conduct and ethics of MTS PJSC**

The leading position of our Company in the market is largely determined by the size and scope of its activities, dynamic development and continuous differentiation of products and services for subscribers. Today, however, it takes more than just seeking to improve investment and operating efficiency to be a successful company. Prominence of our Company obliges us to support its reputation in a best possible way as a socially responsible organisation for our subscribers, shareholders, partners, and all stakeholders and the public.

Code of Business Conduct and Ethics (hereinafter, the Code) contains the basic business principles of MTS PJSC. In its activities, MTS complies with legislation and generally accepted standards of business ethics. The Company does not accept any other ways of doing business that are contrary to these rules.

The Code should be regarded as a document containing a minimum set of standards and requirements adopted by the Company in order to promote fair and ethical business practices and to prevent abuse. The Code defines the rules and standards that should be followed by the employees in their everyday work. In cases requiring application of higher standards than the accepted commercial practice, or

regulations having greater legal force under the current legislation, MTS will use such higher standards.

The Code applies to the members of the Board of Directors, senior management and other employees of the Company.

All employees are responsible for compliance with the Code and are personally responsible for their actions.

***The Code is a fundamental document, which guides us in our daily work and helps us to protect the good name of our Company and maintain our competitive advantage*.**

187. On August 18, 2016, the Company filed a Form 6-K with the SEC, which provided its financial results and position for the fiscal quarter ended June 30, 2016 (the "2016 Q2 6-K"). The 2016 Q2 6-K was signed by Defendant Dubovskov. The 2016 Q2 6-K did not contain any provision or estimated potential liability related to the DOJ or SEC investigations into the Company's corrupt bribery scheme in Uzbekistan. The 2016 Q2 6-K violated IAS 37 because it did not record a liability for MTS's FCPA violations even though it was probable MTS would incur an FCPA related liability. Even if a liability was not probable, it was certainly possible, and MTS could have easily estimated its potential liability under the FCPA as required by IAS 37. Failure to do so violated IAS 37.

188. On August 30, 2016, the Company filed a Form 6-K with the SEC, which provided its Interim Condensed Consolidated Financial Statements As of June 30, 2016 and December 31, 2015 and for the Six Months Ended June 30, 2016 and 2015 (the "2016 Interim Financial Statements"). The 2016 Interim Financial Statements was signed by Defendant Dubovskov. The 2016 Interim Financial Statements gave the misleading impression that the Company would not be able to predict the outcome of the U.S. government's investigations into its Uzbekistan operations, including potential fines or penalties, and that the Company was cooperating with the investigations, stating in relevant part:

> ***Investigations into former operations in Uzbekistan*** — In March 2014, the Group received requests for the provision of information from the United States Securities and Exchange Commission ("SEC") and the United States Department of Justice ("DOJ") relating to a currently conducted investigation of the Group's former subsidiary in Uzbekistan.
>
> In 2015, activities related to the Group's former operations in Uzbekistan have been referenced in a civil forfeiture complaints ("The Complaints"), filed by DOJ in the U.S. District Court, Southern District of New York (Manhattan), directed at certain assets of an unnamed Uzbek government official. The Complaints allege among other things that MTS and certain other parties made corrupt payments to the unnamed Uzbek official to assist their entering and operating in the Uzbekistan telecommunications market. The Complaints are solely directed towards assets held by the unnamed Uzbek official, and none of MTS's assets are affected by the Complaints.
>
> The Company continues to cooperate with these investigations. The Company cannot predict the outcome of the investigations, including any fines or penalties that may be imposed, and such fines or penalties could be significant.

189. On November 17, 2016, the Company filed a Form 6-K with the SEC, which provided its financial results and position for the fiscal quarter ended September 30, 2016 (the "2016 Q3 6-K"). The 2016 Q3 6-K was signed by Defendant Dubovskov. The 2016 Q3 6-K did not contain any provision or estimated potential liability related to the DOJ or SEC investigations into the Company's corrupt bribery scheme in Uzbekistan. The 2016 Q3 6-K violated IAS 37 because it did not record a liability for MTS's FCPA violations even though it was probable MTS would incur an FCPA related liability. Even if a liability was not probable, it was certainly possible, and MTS could have easily estimated its potential liability under the FCPA as required by IAS 37. Failure to do so violated IAS 37.

190. On April 21, 2017, the Company filed a Form 20-F with the SEC, which provided its financial results and position for the fiscal year ended December 31, 2016 (the "2016 20-F"). The 2016 20-F was signed by Defendant Dubovskov. The 2016 20-F contained signed SOX certifications by Defendants Dubovskov and Kornya attesting to the accuracy of financial

reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

191. The 2016 20-F gave the misleading impression that the Company would not be able to predict the outcome of the U.S. government's investigations into its Uzbekistan operations, including potential fines or penalties, and that the Company was cooperating with the investigations. The 2016 20-F stated, in relevant part:

> ***Investigations into former operations in Uzbekistan***—In March 2014, the Group received requests for the provision of information from the United States Securities and Exchange Commission ("SEC") and the United States Department of Justice ("DOJ") relating to a currently conducted investigation of the Group's former subsidiary in Uzbekistan.
>
> In 2015, activities related to the Group's former operations in Uzbekistan have been referenced in a civil forfeiture complaints ("The Complaints"), filed by DOJ in the U.S. District Court, Southern District of New York (Manhattan), directed at certain assets of an unnamed Uzbek government official. The Complaints allege among other things that MTS and certain other parties made corrupt payments to the unnamed Uzbek official to assist their entering and operating in the Uzbekistan telecommunications market. The Complaints are solely directed towards assets held by the unnamed Uzbek official, and none of MTS's assets are affected by the Complaints.
>
> ***The Company continues to cooperate with these investigations.*** The Company cannot predict the outcome of the investigations, including any fines or penalties that may be imposed, and such fines or penalties could be significant.

192. The 2016 20-F did not contain any provision or estimated potential liability related to the DOJ or SEC investigations into the Company's corrupt bribery scheme in Uzbekistan. The 2016 20-F violated IAS 37 because it did not record a liability for MTS's FCPA violations even though it was probable MTS would incur an FCPA related liability. Even if a liability was not probable, it was certainly possible, and MTS could have easily estimated its potential liability under the FCPA as required by IAS 37. Failure to do so violated IAS 37.

193. On May 23, 2017, the Company filed a Form 6-K with the SEC, which provided its financial results and position for the fiscal quarter ended March 31, 2017 (the "2017 Q1 6-K"). The 2017 Q1 6-K was signed by Defendant Dubovskov. The 2017 Q1 6-K did not contain any provision or estimated potential liability related to the DOJ or SEC investigations into the Company's corrupt bribery scheme in Uzbekistan. The 2017 Q1 6-K violated IAS 37 because it did not record a liability for MTS's FCPA violations even though it was probable MTS would incur an FCPA related liability. Even if a liability was not probable, it was certainly possible, and MTS could have easily estimated its potential liability under the FCPA as required by IAS 37. Failure to do so violated IAS 37.

194. On August 28, 2017, the Company filed a Form 6-K with the SEC, which provided its financial results and position for the fiscal quarter ended June 30, 2017 (the "2017 Q2 6-K"). The 2017 Q2 6-K was signed by Defendant Dubovskov. The 2017 Q2 6-K did not contain any provision or estimated potential liability related to the DOJ or SEC investigations into the Company's corrupt bribery scheme in Uzbekistan. The 2017 Q2 6-K violated IAS 37 because it did not record a liability for MTS's FCPA violations even though it was probable MTS would incur an FCPA related liability. Even if a liability was not probable, it was certainly possible, and MTS could have easily estimated its potential liability under the FCPA as required by IAS 37. Failure to do so violated IAS 37.

195. On November 14, 2017, the Company filed a Form 6-K with the SEC, which provided its financial results and position for the fiscal quarter ended September 30, 2017 (the "2017 Q3 6-K"). The 2017 Q3 6-K was signed by Defendant Dubovskov. The 2017 Q3 6-K did not contain any provision or estimated potential liability related to the DOJ or SEC investigations into the Company's corrupt bribery scheme in Uzbekistan. The 2017 Q3 6-K violated IAS 37

because it did not record a liability for MTS's FCPA violations even though it was probable MTS would incur an FCPA related liability. Even if a liability was not probable, it was certainly possible, and MTS could have easily estimated its potential liability under the FCPA as required by IAS 37. Failure to do so violated IAS 37.

196. On April 27, 2018, the Company filed a Form 20-F with the SEC, which provided its financial results and position for the fiscal year ended December 31, 2017 (the "2017 20-F"). The 2017 20-F was signed by Defendant Kornya. The 2017 20-F contained signed SOX certifications by Defendants Kornya and Kamensky[] attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

197. The 2017 20-F gave the misleading impression that the Company would not be able to predict the outcome of the U.S. government's investigations into its Uzbekistan operations, including potential fines or penalties, and that the Company was cooperating with the investigations. The 2017 20-F stated, in relevant part:

> ***Investigations into former operations in Uzbekistan***—In March 2014, the Group received requests for the provision of information from the United States Securities and Exchange Commission ("SEC") and the United States Department of Justice ("DOJ") relating to a currently conducted investigation of the Group's former subsidiary in Uzbekistan.
>
> In 2015, activities related to the Group's former operations in Uzbekistan have been referenced in a civil forfeiture complaints ("The Complaints"), filed by DOJ in the U.S. District Court, Southern District of New York (Manhattan), directed at certain assets of an unnamed Uzbek government official. The Complaints allege among other things that MTS and certain other parties made corrupt payments to the unnamed Uzbek official to assist their entering and operating in the Uzbekistan telecommunications market. The Complaints are solely directed towards assets held by the unnamed Uzbek official, and none of MTS's assets are affected by the Complaints.
>
> ***The Group [i.e., Mobile TeleSystems and subsidiaries] continues to cooperate with these investigations***. The Group, the DOJ and the SEC are having discussions

> about a potential resolution to allegations of non-compliance with the Foreign Corrupt Practices Act (FCPA). However, at this stage, the Group is unable to predict whether or not such discussions will result in a settled resolution to the investigations, the magnitude of any settlement, or whether there will be further developments in the investigations.

198. The 2017 20-F did not contain any provision or estimated potential liability related to the DOJ or SEC investigations into the Company's corrupt bribery scheme in Uzbekistan. The 2017 20-F violated IAS 37 because it did not record a liability for MTS's FCPA violations even though it was probable MTS would incur an FCPA related liability. Even if a liability was not probable, it was certainly possible, and MTS could have easily estimated its potential liability under the FCPA as required by IAS 37. Failure to do so violated IAS 37.

199. On May 23, 2018, the Company filed a Form 6-K with the SEC, which provided its financial results and position for the fiscal quarter ended March 31, 2018 (the "2018 Q1 6-K"). The 2018 Q1 6-K was signed by Defendant Kornya. The 2018 Q1 6-K did not contain any provision or estimated potential liability related to the DOJ or SEC investigations into the Company's corrupt bribery scheme in Uzbekistan. The 2018 Q1 6-K violated IAS 37 because it did not record a liability for MTS's FCPA violations even though it was probable MTS would incur an FCPA related liability. Even if a liability was not probable, it was certainly possible, and MTS could have easily estimated its potential liability under the FCPA as required by IAS 37. Failure to do so violated IAS 37.

200. On August 21, 2018, the Company filed a Form 6-K with the SEC, which provided its financial results and position for the fiscal quarter ended June 30, 2018 (the "2018 Q2 6-K"). The 2018 Q2 6-K was signed by Defendant Kornya. The 2018 Q2 6-K did not contain any provision or estimated potential liability related to the DOJ or SEC investigations into the Company's corrupt bribery scheme in Uzbekistan. The 2018 Q2 6-K violated IAS 37 because it

did not record a liability for MTS's FCPA violations even though it was probable MTS would incur an FCPA related liability. Even if a liability was not probable, it was certainly possible, and MTS could have easily estimated its potential liability under the FCPA as required by IAS 37. Failure to do so violated IAS 37.

201. The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) MTS and its subsidiary were involved in a scheme to pay $420 million in bribes in Uzbekistan; (2) consequently, Defendants knew or should have known it would be forced to pay substantial fines to the U.S. government after disclosing in 2014 that the U.S. DOJ and SEC were investigating its Uzbekistan operations; (3) MTS's level of cooperation with the U.S. government and remediation was lacking; (4) MTS had not remediated its internal controls or compliance; (5) due to the aforementioned misconduct, MTS would be forced to pay approximately $850 million in criminal penalties to the U.S. government; and (6) due to the foregoing, Defendants' public statements were materially false and/or misleading at all relevant times.

**The Truth Begins to Emerge**

202. On November 20, 2018, the Company filed a Form 6-K with the SEC, which provided its financial results and position for the fiscal quarter ended September 30, 2018 (the "2018 Q3 6-K"). The 2018 Q3 6-K was signed by Defendant Kornya. The 2018 Q3 6-K disclosed, for the first time, that the Company had reserved approximately $840 million USD (RUB 55.8 bln) as the potential liability concerning investigations by the SEC and the DOJ into its former

operations in Uzbekistan. The 2018 Q3 6-K misled investors by stating that the Company continued to cooperate with US investigators, stating in relevant part:

> In its Q3 2018 financial statements, MTS reserved RUB 55.8 bln as the potential liability with respect to the investigation being conducted by the U.S. Securities and Exchange Commission (SEC) and the U.S. Department of Justice (DOJ) in relation to its former operations in Uzbekistan. MTS continues to cooperate with the U.S. authorities in the ongoing investigation. There can be no assurance as to the form, timing or terms of any resolution to the investigation. As a result of this provision recognition the Group finished Q3 2018 with Net loss of RUB 37.0 bln. Excluding this one-off factor, the Group would have reported Net profit of RUB 18.7 bln.

203. Also on November 20, 2018, the Company hosted an earnings conference call with analysts and investors. On the call, Defendant Kornya stated in response to a question from an analyst that the Company finally recognized the provision because it had "more visibility towards the potential outcome," stating in relevant part:

> **<Q>**: Yes, sorry. Just on the timing, my question was not on the investigation, but just as to why you decided to take that provision in that specific quarter.
>
> **<A - Alexey Valeryevich Kornya>**: That – in accordance with IFRS standards, we need to provide when we can evaluate potential outcomes from such an investigation. So, right now, we feel having more visibility towards the potential outcome, and for that reason, we have made this evaluation and made provisions.

204. On this news, shares of Mobile TeleSystems' stock price fell $0.64 per share or nearly 8% to close at $7.45 per share on November 20, 2018.

205. On March 7, 2019, the DOJ reported that the Company and its subsidiary entered into an agreement to pay $850 million in penalties to the United States to resolve charges arising from its role in a scheme to pay $420 million in bribes in Uzbekistan. The DOJ's press release states, in relevant part:

> **Mobile Telesystems Pjsc and Its Uzbek Subsidiary Enter into Resolutions of $850 Million with the Department of Justice for Paying Bribes in Uzbekistan**

**Former General Director of MTS's Uzbek Subsidiary and Former Uzbek Official Charged in Bribery and Money Laundering Scheme Totaling Almost $1 Billion**

***Moscow-based Mobile TeleSystems PJSC (MTS), the largest mobile telecommunications company in Russia and an issuer of publicly traded securities in the United States, and its wholly owned Uzbek subsidiary, KOLORIT DIZAYN INK LLC (KOLORIT), have entered into resolutions with the Department of Justice and Securities and Exchange Commission (SEC) and agreed to pay a combined total penalty of $850 million to resolve charges arising out of a scheme to pay bribes in Uzbekistan.*** In addition, charges were unsealed today against a former Uzbek official who is the daughter of the former president of Uzbekistan and against the former CEO of Uzdunrobita LLC, another MTS subsidiary, for their participation in a bribery and money laundering scheme involving more than $865 million in bribes from MTS, VimpelCom Limited (now VEON) and Telia Company AB (Telia) to the former Uzbek official in order to secure her assistance in entering and maintaining their business operations in Uzbekistan's telecommunications market.

* * *

According to the indictment against Karimova and Akhmedov, in or around the early 2000s, they agreed that Akhmedov would solicit and facilitate corrupt bribe payments from telecommunications companies seeking to enter the Uzbek market. In exchange, Karimova allegedly used her influence over Uzbek authorities to help the telecommunications companies obtain and retain lucrative business opportunities in the Uzbek telecommunications market. In total, Akhmedov conspired with the telecom companies and others to pay Karimova more than $865 million in bribes, and Akhmedov and Karimova conspired with others to launder and conceal those funds to, from and through bank accounts in the United States, in order to promote the ongoing bribery scheme, the indictment alleges.

* * *

MTS entered into a deferred prosecution agreement with the Department of Justice in connection with a criminal information filed yesterday in the Southern District of New York charging the company with one count of conspiracy to violate the anti-bribery and books and records provisions of the FCPA and one count of violating the internal controls provisions of the FCPA. KOLORIT pleaded guilty to a one-count criminal information filed in the Southern District of New York, charging the company with conspiracy to violate the anti-bribery and books and records provisions of the FCPA. Pursuant to its agreement with the department, MTS agreed to pay a total criminal penalty of $850 million to the United States, including a $500,000 criminal fine and $40 million in criminal forfeiture that MTS agreed to pay on behalf of KOLORIT. MTS also agreed to the imposition of an independent compliance monitor for a term of three years and to implement rigorous internal controls and cooperate fully with the Department's ongoing investigation, including its investigation of individuals such as Akhmedov and Karimova. The case against MTS and KOLORIT is assigned to U.S. District Judge J. Paul Oetken of the Southern District of New York.

In related proceedings, MTS reached a settlement with the SEC. Under the terms of its agreement with the SEC, MTS agreed to pay a $100 million civil penalty. Consistent with Coordination of Corporate Resolution Penalties in Parallel and/or Joint Investigations and Proceedings Arising from the Same Misconduct (Justice Manual 1-12.100), the Department of Justice agreed to credit the civil penalty paid to the SEC as part of its agreement with MTS. Thus, the combined total amount of criminal and regulatory penalties paid by MTS and KOLORIT to U.S. authorities will be $850 million.

***According to the companies' admissions, MTS and KOLORIT, through various managers and employees within MTS, MTS's Uzbek subsidiaries Uzdunrobita LLC and KOLORIT, and other affiliated entities, paid approximately $420 million in bribes to Karimova, who had influence over the Uzbek governmental body that regulated the telecom industry. The bribes were paid on multiple occasions between 2004 and 2012 so that MTS could enter the Uzbek market through the acquisition of Uzdunrobita and so that Uzdunrobita could gain valuable telecom assets and continue operating in Uzbekistan. The companies admittedly structured and concealed the bribes through payments to shell companies that members of MTS's and Uzdunrobita's management knew were beneficially owned by Karimova. MTS and Uzdunrobita also acquired KOLORIT, knowing that the price MTS and Uzdunrobita paid was inflated, in order to bribe Karimova in exchange for Uzdunrobita's continuing to operate in Uzbekistan. Uzdunrobita made payments to purported charities and for sponsorships to entities related to Karimova. The Uzbek government expropriated Uzdunrobita in 2012 as a result of MTS's, Uzdunrobita's and KOLORIT's failure to meet Karimova's demands for additional payments.***

***A number of factors contributed to the Department's criminal resolution with the companies, including (1) the companies did not voluntarily disclose; (2) the companies' level of cooperation and remediation was lacking, not proactive; (3) the nature and seriousness of the office, including $420 million in bribes to a high-level Uzbek official; and (4) the mitigating factors present in this case, including that the Uzbek government expropriated the companies' telecommunications assets in Uzbekistan, resulting in no realized pecuniary gain to the companies as a result of the misconduct.***

(Emphasis added.)

206. On this news, shares in Mobile TeleSystems' stock fell $0.24 per share or over 3% to close at $7.54 per share on March 7, 2019, damaging investors.

207. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

208. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Mobile TeleSystems during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

209. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

210. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

211. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

212. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' acts as alleged violated the federal securities laws;

(b) whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c) whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e) whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f) whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

213. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

214. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities are traded in efficient markets;

(d) the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e) the Company traded on the NYSE, and was covered by multiple analysts;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiffs and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g) Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

215. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

216. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of*

*Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

217. Plaintiffs repeat and realleges each and every allegation contained above as if fully set forth herein.

218. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

219. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

220. The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

221. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

222. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

223. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

224. Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

225. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

226. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act Against the Individual Defendants

227. Plaintiffs repeat and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

228. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

229. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

230. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

231. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

232. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated: November 12, 2019

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Philip Kim
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

*Counsel for Plaintiffs*