UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X
SHAYAN SALIM, Individually and on behalf of all
others similarly situated,

                              Plaintiffs,

           – against –

MOBILE TELESYSTEMS PJSC, ANDREI A.
DUBOVSKOV, ALEXEY V. KORNYA, and
ANDREY KAMENSKY,

                             Defendants.
--------------------------------------------------------------- X

**MEMORANDUM
DECISION AND ORDER**
19-CV-1589 (AMD) (RLM)

**ANN M. DONNELLY**, United States District Judge:

Before the Court is Mobile Telesystems PJSC's ("MTS") motion to dismiss the Second

Amended Complaint ("SAC").  For the reasons that follow, the motion is granted.[1]

On March 19, 2019, the plaintiff brought this class action on behalf of himself and all

others similarly situated against MTS and three executives—Andrei Dubovskov, Alexey Kornya,

and Andrey Kamensky.[2]  (ECF No. 1.)  On April 6, 2020 the plaintiff filed the SAC.[3]  (ECF No.

31.)

From 2004 through 2012, MTS paid bribes to an Uzbek government official in order to

secure operating licenses in the Uzbek telecommunications market.  In the SAC, the plaintiffs

allege that between 2014 and 2019 (the "Class Period"), MTS issued false and misleading

statements about the company's potential liability for the bribery scheme, the effectiveness of the

company's internal controls and compliance structure, and the company's cooperation with U.S.

---

[1] I heard oral argument on December 11, 2020.
[2] On September 11, 2019, Magistrate Judge Roanne L. Mann appointed Hunnewell Partners (UK) LLP as the lead plaintiff and the Rosen Law Firm P.A. as lead class counsel.  (ECF No. 22.)
[3] The plaintiff filed the SAC after discussion at the pre-motion conference about the sufficiency of the allegations in the original complaint.

investigators.  (ECF No. 31 ¶¶ 3-9.)  According to the SAC, the defendants' misstatements and omissions artificially inflated MTS's stock price, causing the plaintiffs to suffer a loss after the company entered into a Deferred Prosecution Agreement ("DPA") with the Department of Justice ("DOJ") in 2019.  (*Id.* at ¶¶ 12- 13.)  The plaintiffs claim that the defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and that defendants Dubovskov, Kornya and Kamensky (the "Individual Defendants") violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).[4]  (*Id.* ¶ 14.)

MTS moves to dismiss, arguing that the plaintiffs have not alleged any actionable misstatements or omissions, and that they did not sufficiently plead scienter.  (ECF No. 33.)

## BACKGROUND[5]

MTS is a Moscow-based telecommunications company that provides services in Russia, Ukraine, Turkmenistan and Armenia.  (ECF No. 31 at ¶ 20.)  From 2004 to 2012, MTS conspired to pay over $420 million in illegal bribes for the benefit of an Uzbek government official, Gulnara Karimova, so that it could operate in the Uzbek telecommunications market. (*Id.* at ¶ 2.)  The company operated in Uzbekistan until 2012, when it refused to continue meeting Karimova's bribery demands.  (*Id.* at ¶¶ 94-97.)

### I.   DOJ & SEC Investigations

On March 18, 2014, Reuters reported that international scrutiny over the Uzbek telecommunications market was growing, and that the SEC was investigating two of MTS's rivals—VimpelCom and TeliaSonera—for misconduct.  (*Id.* at ¶ 166.)  The following year, it

---

[4] The individual defendants, who are currently in Russia, have not been served and have not appeared in this action.

[5] The facts are taken from the complaint, assumed to be true for purposes of this motion, and are read in the light most favorable to the plaintiffs. *See Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013).

was publicly reported that MTS, VimpelCom and TeliaSonera paid bribes to Uzbek officials to obtain business contracts.  (*Id.* at ¶ 167.)

On June 29, 2015, the DOJ filed a complaint in the Southern District of New York against *in rem* accounts controlled by Karimova, seeking forfeiture of approximately $300 million in assets; the complaint detailed hundreds of millions of dollars in corrupt payments by MTS, and identified MTS as an "issuer" as defined by the Foreign Corrupt Practices Act ("FCPA").  (*Id.*; ECF No. 31-5.)  On February 18, 2016, the DOJ filed another *in rem* complaint in the SDNY, this time identifying eight specific transactions between MTS and Karimova totaling over $380 million.  (*Id.* at ¶ 168.)  That same day, the DOJ disclosed that it had entered into a DPA with VimpelCom in which VimpelCom agreed to pay $795 million to resolve an investigation into illegal bribe payments in Uzbekistan.  (*Id.* at ¶ 157.)  TeliaSonera also entered into a DPA on September 21, 2017, and agreed to pay $965 million to resolve the investigation. (*Id.*)

MTS entered into a DPA with the DOJ on February 22, 2019,  in which the company agreed to pay a penalty of $850 million to resolve charges of conspiracy to violate the anti-bribery and books and records provisions of the FCPA, and violating the internal controls provisions of the FCPA.[6]  (*Id.* at ¶¶ 5, 116.)  MTS did not receive voluntary disclosure credit because it did not "voluntarily and timely self-disclose" the corrupt payments.  (ECF No. 31-2 at ¶ 4.)  The DOJ did not give MTS "additional credit for cooperation and remediation" because it "significantly delayed production of certain relevant materials, refused to support interviews with current employees during certain periods of the investigation, and did not appropriately remediate, including by failing to take adequate disciplinary measures with respect to executives

---

[6] At some point prior to entering into the DPA, MTS hired Debevoise & Plimpton LLP to conduct an internal investigation into its business in Uzbekistan.  (*Id.* at ¶ 170.)

and other employees involved in the misconduct." (*Id.*)  However, the DOJ deducted two points from MTS's culpability score because the company "ultimately provided" the DOJ with "all relevant information" as that term is defined in the U.S. Sentencing Guidelines.  (*Id.*)  The DPA also noted that MTS had inadequate anti-corruption controls during the period of misconduct, but had since enhanced its compliance program.  (*Id.*)

On March 6, 2019, the SEC announced that MTS consented to an SEC order finding that it violated the anti-bribery, books and records and internal accounting control provisions of the Securities Exchange Act of 1934 and requiring it to pay a $100 million fine.  The DOJ credited the $100 million SEC fine in the DPA.  (ECF No. 31 at ¶ 129.)

## II.    Public Disclosures

MTS made various public disclosures during the Class Period related to the DOJ and SEC investigations.

### a.  Form 20-F Filings

On March 19, 2014, MTS disclosed that the DOJ was investigating it for conduct related to its operations in Uzbekistan.  (*Id.* at ¶ 181.)  On April 24, 2014, the company filed a Form 20-F with the SEC, which included the following statement:

> [I]n March 2014, we received requests for the provision of information from the United States Securities and Exchange Commission and the United States Department of Justice related to an investigation of the Group's former subsidiary in Uzbekistan. . .. As the aforementioned US government investigations are at an early stage, we cannot predict the outcome of the investigations, including any fines or penalties that may be imposed, and such fines or penalties could be significant.  Any investigation of any potential violations of the FCPA, the UK Bribery Act or other anti-corruption laws by US, UK or foreign authorities could have an adverse impact on our business, financial condition and results of operations.

(ECF No. 34-4 at 7.)  MTS did not say anything at this point about whether it was cooperating

with the investigation.  MTS's Form 20-F, filed on April 21, 2015, included the same disclosures

in the previous year's Form 20-F.  (ECF No. 31 at ¶¶ 188-89.)

In its April 20, 2016 Form 20-F, MTS included additional detail about the investigations

into its conduct in Uzbekistan and its cooperation with authorities.  The filing stated in relevant

part:

> In March 2014, the Group received requests for the provision of information from the
> United States Securities and Exchange Commission ("SEC") and the United States
> Department of Justice ("DOJ") relating to a currently conducted investigation of the
> Group's former subsidiary in Uzbekistan.
>
> In July 2015, activities related to the Group's former operations in Uzbekistan have been
> referenced in a civil forfeiture complaint ("The Complaint"), filed by DOJ in the U.S.
> District Court, Southern District of New York (Manhattan), directed at certain assets of
> an unnamed Uzbek government official. The Complaint alleges among other things that
> MTS and certain other parties made corrupt payments to the unnamed Uzbek official to
> assist their entering and operating in the Uzbekistan telecommunications market. The
> Complaint is solely directed towards assets held by the unnamed Uzbek official, and none
> of MTS's assets are affected by the Complaint.
>
> The Company continues to cooperate with these investigations. The Company cannot
> predict the outcome of the investigations, including any fines or penalties that may be
> imposed, and such fines or penalties could be significant.

(*Id.* at ¶ 197.)  The filing also included the disclosure in the 2014 and 2015 filings—that a

bribery investigation had the potential to have an adverse impact on MTS's business.  (ECF No.

34-6.)  The company's April, 21, 2017 Form 20-F contained substantially the same language as

the 2016 filing.  (ECF No. 31 at ¶¶ 206-07.)

On April 27, 2018, MTS filed a Form 20-F providing its financial results for the fiscal

year ending December 31, 2017.  (*Id.* at ¶ 217.)  This filing provided additional detail about the

company's cooperation and stated in relevant part:

> In March 2014, the Group received requests for the provision of information from the
> United States Securities and Exchange Commission ("SEC") and the United States

Department of Justice ("DOJ") relating to a currently conducted investigation of the Group's former subsidiary in Uzbekistan.

In 2015, activities related to the Group's former operations in Uzbekistan have been referenced in a civil forfeiture complaints ("The Complaints"), filed by DOJ in the U.S. District Court, Southern District of New York (Manhattan), directed at certain assets of an unnamed Uzbek government official. The Complaints allege among other things that MTS and certain other parties made corrupt payments to the unnamed Uzbek official to assist their entering and operating in the Uzbekistan telecommunications market. The Complaints are solely directed towards assets held by the unnamed Uzbek official, and none of MTS's assets are affected by the Complaints.

The Group [i.e., Mobile TeleSystems and subsidiaries] continues to cooperate with these investigations. The Group, the DOJ and the SEC are having discussions about a potential resolution to allegations of non-compliance with the Foreign Corrupt Practices Act (FCPA). However, at this stage, the Group is unable to predict whether or not such discussions will result in a settled resolution to the investigations, the magnitude of any settlement, or whether there will be further developments in the investigations.

(*Id.* at ¶ 218.)

        *b.  Form 6-K Filings*

In November of 2014, MTS filed a Form 6-K with the SEC disclosing its financial results and position for the fiscal year ending September 30, 2014.  (ECF No. 31 at ¶ 187.)  The 6-K did "not contain any accrued liability related to the DOJ or SEC investigations" into MTS's conduct in Uzbekistan, nor did it "adequately disclose" that the company was "subject to prosecution for serious FCPA violations."  (*Id.* at ¶ 187.)  On May 19, 2015, MTS filed another Form 6-K reporting its financial results for the first quarter of 2015; the disclosures were similar to the September 2014 6-K disclosures.  (*Id.* at ¶ 192.)

On August 18, 2015, MTS filed a Form 6-K that included additional language about the company's "cooperat[ion] with the SEC and DOJ investigations in good faith."  (*Id.* at ¶ 193.)

MTS affirms that the alleged activities related to MTS's business in Uzbekistan have been referenced in a civil forfeiture complaint, filed by US Department of Justice (DOJ) in the U.S. District Court, Southern District of New York (Manhattan), directed at certain assets of an unnamed Uzbek government official. The Complaint alleges among other things that MTS and certain other parties made corrupt payments to the unnamed Uzbek

official to assist their entrance and operations in the Uzbekistan telecommunications market. The Complaint is solely directed towards assets held by the unnamed Uzbek official, and none of MTS's assets are affected by the Complaint.

As MTS disclosed in March 2014, both the US Securities and Exchange Commission (SEC) and DOJ are currently conducting an investigation related to MTS's former operations in Uzbekistan. As previously disclosed, the Company has received requests for documents and information from both the SEC and DOJ and continues to cooperate with these investigations in good faith.

(*Id.*)  On November 17, 2015, MTS filed a Form 6-K with its financial results for the fiscal quarter ending September 30, 2015.  (*Id.* at ¶ 194.)  In addition to repeating its earlier disclosure that it was cooperating with the DOJ and SEC investigations, MTS represented that it had "made no provision in relation to the investigation" because it had "no reliable basis to predict any outcome."  (*Id*)

In multiple Form 6-Ks from May 19, 2016 to August 21, 2018, MTS included substantially similar language about the status of the ongoing investigation and the company's inability to predict the outcome.  (*Id.* at ¶¶ 199, 203, 204, 206-09, 215-16, 220, 224.)

    *c.  Annual Reports*

MTS also made incremental changes to the language in its annual reports during the Class Period.  In its 2014 Annual Report, published on June 24, 2015, MTS stated that "the Company's compliance with its Code of Business Conduct and Ethics helps to protect the Company's good name and maintain the Company's competitive advantage."  (*Id.* at ¶ 190.)  The report also "touted the Company's corporate compliance system, including the Company's commitment to compliance with the FCPA and its zero-tolerance policy towards corruption."  (*Id.* ¶ 191.)  The report did not contain any disclosures specific to the DOJ and SEC investigation into the company's business in Uzbekistan.

In addition to similar language regarding the company's compliance with general standards of business ethics and its own code of conduct, MTS's 2015 Annual Report included information about the ongoing investigation into misconduct in Uzbekistan. (*Id.* at ¶¶ 200-03.) The report stated:

> In March 2014, MTS PJSC received a request for information from the US Securities and Exchange Commission and the US Department of Justice regarding the investigation of the former subsidiary in Uzbekistan. MTS PJSC is cooperating with the above-mentioned organisations: it provided the information upon request and continues to provide answers on demand. Since the investigation has not been completed, there is no way to predict its outcome, including the possible imposition of fines and penalties which could be significant.

(*Id.* at ¶ 200.) The company's 2016 Annual Report and 2017 Annual Report contained comparable language (*Id.* at ¶¶ 210-11, 221-23); the 2016 report also "touted the Company's implementation of anti-corruption compliance systems during 2016" and "announced that the Company had adopted a unified compliance system and established a Compliance Committee." (*Id.* at ¶¶ 212-14).

## III.    Stock Price Movement

In a Form-6K filed on November 20, 2018, MTS disclosed that it had reserved approximately $840 million USD (RUB 55.8 bln) to resolve the SEC and DOJ investigations. (*Id.* at ¶ 227.) That same day, the company hosted an earnings conference call with analysts and investors during which defendant Kornya stated that MTS had "more visibility towards the potential outcome" of the investigations. (*Id.* at ¶ 228.) Following this announcement, MTS's stock price fell $0.64 per share to close at $7.45. (*Id.* at ¶ 229.)

On March 7, 2019, the DOJ reported that MTS and its subsidiary entered into a DPA and agreed to pay $850 million in penalties to resolve charges arising from the Uzbekistan bribery scheme. (*Id.* at ¶ 230.) That day, MTS's stock fell $0.24 per share to close at $7.54 per share.

The plaintiffs allege that the MTS's "false and misleading statements caused the precipitous decline in the market value of the Company's securities," and as a result, the plaintiffs and Class members "have suffered significant losses and damages." (*Id.* at ¶ 232.)

The plaintiffs, on behalf of a putative class, claim that MTS engaged in securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 and its implementing regulation, Rule 10b-5, because it did not timely record a reserve, filed misleading statements about the nature of the government's investigation and the extent of the company's cooperation with it, and filed misleading statements about the company's compliance with its code of conduct (Count I). (*Id.* at ¶¶ 248-57.) They also claim that the Individual Defendants are liable under Section 20(a) of the Exchange Act as controlling persons of MTS with the power to direct activities that comprised the securities violations (Count II). (*Id.* at ¶¶ 258-63.) On May 21, 2020, MTS moved for dismissal, arguing that the plaintiffs have not adequately pled any false or misleading statements, or the required "strong inference" of scienter. (ECF No. 33.) As explained below, that motion is granted.

## DISCUSSION

In order to survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In a securities fraud case, the court may consider "any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the [SEC], and documents that the plaintiffs either possessed or knew

about and upon which they relied in bringing the suit." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015) (internal alterations and citation omitted).

A plaintiff alleging securities fraud must comply with the heightened pleading requirements detailed in Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u–4(b). *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (affirming that securities fraud claims must satisfy the heightened pleading standards of both Rule 9(b) and the PSLRA); *In re Sterling Foster & Co., Inc., Sec. Litig.*, 222 F. Supp. 2d 216, 269 (E.D.N.Y. 2002) (noting that the PSLRA was intended to make the "pleading requirements for securities fraud cases more demanding"). Under Rule 9(b), a plaintiff must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "[T]o satisfy this requirement the plaintiff must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). Under the PSLRA, a securities fraud plaintiff must "specify each misleading statement," explain why the statement is misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (citing *Dura Pharms., Inc v. Broudo*, 544 U.S. 336, 345 (2005) (internal quotation marks and alterations omitted)); *see also* 15 U.S.C. § 78u–4(b)(1), (2)).

## I.    Section 10(b) Claim

"Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful to 'use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of [the] rules and regulations' that the SEC

prescribes." *Stratte-McClure*, 776 F.3d at 100 (citing 15 U.S.C. § 78j); *see also* 17 C.F.R. §

240.10b-5.  To sustain claims under Section 10(b) or Rule 10b-5, a complaint must plausibly

allege: "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of

mind; (3) a connection with the purchase or sale of a security; (4) reliance . . . ; (5) economic

loss; and (6) loss causation."  *Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019) (quoting

*Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013) (internal quotation marks and

brackets omitted)).

     A.     <u>Material Misrepresentations or Omissions</u>

The plaintiffs' allegations of misleading statements or omissions can be grouped into four

categories: (i) recording a reserve; (ii) disclosures about the nature of the DOJ and SEC

investigations; (iii) statements that MTS was cooperating with the investigation; and (iv)

statements regarding MTS's compliance with its code of ethics.

     *1.     Recording a Reserve*

     a.     <u>Accounting Principles</u>

The plaintiffs allege that MTS violated the Generally Accepted Accounting Principles'

("GAAP") Accounting Standard Codification ("ASC") 450 and the International Financial

Reporting Standards' ("IFRS") International Accounting Standard ("IAS") 37 because it did not

timely record a reserve for potential fines resulting from the DOJ and SEC investigations.[7]

ASC 450 defines a loss contingency as an "existing condition, situation, or set of

circumstances involving uncertainty as to possible loss to an entity that will ultimately be

resolved when one or more future events occur or fail to occur."  ASC 450-20-20.  "ASC 450

---

[7] MTS prepared its financial statements in accordance with GAAP before fiscal year 2015, and then
switched to IFRS.  (ECF No. 32-1 at 15.)  Thus, ASC 450 applies to statements before 2015, and IAS 37
applies to statements in 2015 and the years following.

contains provisions addressing when the loss contingency must be accrued and when, if not

accrued, it must nonetheless be disclosed." *In re Perrigo Co. PLC Sec. Litig.*, 435 F. Supp. 3d

571, 582 (S.D.N.Y. 2020).  The accrual section provides that:

> An estimated loss from a loss contingency shall be accrued by a charge to income if both
> of the following conditions are met:
>
>> a. Information available before the financial statements are issued ... indicates that
>> it is <u>probable that</u> an asset had been impaired or a <u>liability had been incurred</u> at the
>> date of the financial statements.... It is implicit in this condition that it must be
>> probable that one or more future events will occur confirming the fact of the loss.
>
>> b. The amount of loss can be <u>reasonably estimated</u>.

ASC 450-20-25-2 (emphasis added).  When no accrual is made, either because the loss is not

"probable" or because the amount of loss cannot be "reasonably estimated," the loss contingency

must nevertheless be disclosed "if there is at least a reasonable possibility that a loss . . . may

have been incurred."  ASC 450-20-50-3.  "Reasonably possible" means that the chance of

occurrence is "more than remote but less than likely."  ASC 450-20-20.

IAS 37 contains similar reporting obligations.  Companies must disclose the existence of

a contingent liability "unless the possibility of an outflow of resources embodying economic

benefits is remote."  *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 809 (S.D.N.Y. 2018).  A

contingent liability is "a possible obligation that arises from past events and whose existence will

be confirmed only by the occurrence or non-occurrence of one or more uncertain future events

not wholly within the control of the entity . . . ."  IAS 37.

According to the plaintiffs, MTS could have made a reasonable and reliable estimate of

its potential liability.  In particular, the plaintiffs maintain that MTS would have "learned of each

FCPA violation and the amount of each bribe and thus could have easily estimated the minimum

amount of MTS's contingent liability emanating from MTS's FCPA violations" if it had

"performed a reasonable investigation." (ECF No. 31 at ¶ 155.) The plaintiffs allege that MTS should have been able to calculate and report its potential liability before November of 2018 because the FCPA provides a "predictable structure for calculating penalties." (*Id*. at ¶ 156.)

"Three factors are relevant in determining whether threatened litigation constitutes a qualifying loss contingency subject to accrual or disclosure: (1) when the cause of action arose; (2) the degree of probability of an unfavorable outcome; and (3) the ability to make a reasonable estimate of loss." *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 21 (S.D.N.Y. 2016). MTS does not deny that the plaintiffs have established first factor, but it argues that they have not sufficiently pled that MTS's potential loss was either probable or reasonably estimable at any time before it recorded a reserve of $850 million in November of 2018. I agree.

According to the plaintiffs, MTS could have easily estimated its loss; they say that MTS knew "(i) [it] had violated the FCPA, (ii) it was probable that its violations would result in a material loss to MTS, and (iii) of the dollar amount of corrupt bribes the Company had paid in violation of the FCPA, and could thus reasonably estimate the amount of that loss" as soon as it was aware that the DOJ was investigating. (*Id.* at ¶ 160.) In my view, the circumstances were far less obvious and straightforward. When MTS learned of the investigation, it could not predict the outcome: whether the government would file charges, what those charges would be, whether the government would have agreed to a DPA at all and, if it did, what its terms would be. Nor could the company predict whether it would be willing to settle, or would contest the charges, assuming there were charges. And, at that point, MTS was not cooperating with the DOJ and could not predict whether it would ultimately receive cooperation or remediation credit.

The plaintiffs list a series of dates on which they claim that MTS should have been able to predict its liability: on March 19, 2014, when the company disclosed that the SEC had opened

an investigation; on June 30, 2015, when the DOJ filed an *in rem* action against Karimova, and listed payments for which MTS was responsible;[8] on February 18, 2016 when the DOJ filed a second *in rem* complaint against Karimova's bank accounts with additional detail about the payments the DOJ was investigating; and on an unspecified date when Debevoise & Plimpton LLP concluded an internal investigation into MTS's Uzbekistan business.  (*Id.* at ¶¶ 166-70.)  As an initial matter, even with the benefit of hindsight, the plaintiffs cannot fix the precise date on which MTS could have estimated its loss.  However, even if MTS learned more about the government's investigation on each of these dates, the plaintiffs have not sufficiently alleged how the information changed MTS's ability to estimate its total loss.[9]

Finally, observing that "FCPA violations are formulaic and predictable" the plaintiffs say that MTS knew how much it paid in bribes and should have been able to estimate its liability.  (*Id.* at ¶¶ 171-73.)  At the same time, however, the plaintiffs cite the outcomes of the investigations into VimpelCom and TeliaSonera, assertedly similar cases with significantly different resolutions.  According to the SAC, the DOJ credited both companies with "fully remediating," entitling them to downward departures from the penalties established by the U.S. Sentencing Guidelines ("USSG").  (*Id.* at ¶¶ 126-27.)  Nevertheless, VimpelCom's total monetary penalty was 45% below the low end of its possible fine range, and TeliaSonera's was 25% below the low end of its possible fine range.  (*Id.*)  As these examples demonstrate, it is difficult to predict even the minimum amount for which a company may be liable.  Indeed, had

---

[8] At oral argument, the plaintiffs maintained that MTS could have made a liability calculation by June of 2015 "at the very latest" based on the complaint filed in the SDNY.  (Tr. at 7:7-21.)

[9] *Securities and Exchange Commission v. RPM International, Inc.* does not compel a different conclusion. 282 F. Supp. 3d 1, 22 (D.D.C. 2017).  There, RPM "had already calculated $11.4 million worth of liability to the government," had begun discussing settlement options with the DOJ, and knew that the government intended to intervene in the *qui tam* action.  *Id.*  The SAC does not contain comparable allegations.

MTS recorded a reserve 45% below the USSG range, and then agreed in a DPA to pay 25% below the USSG range, the plaintiffs would undoubtedly have taken issue with the company's reporting.

Accordingly, the plaintiffs have not demonstrated that MTS violated ASC 450 or IAS 37 by waiting to record a reserve until November of 2018.

b.   Omnicare Standard

MTS argues that because ASC 450 and IAS 37 require entities to make a judgment about whether the amount of potential loss can be reasonably estimated, the plaintiffs cannot plead a violation unless they establish that MTS's subjective judgment in this regard was false.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186-90 (2015).  Subjective statements of opinion must be analyzed under the *Omnicare* standard, and can be actionable only if either "the speaker did not hold the belief she professed" or "the supporting fact[s] she supplied were untrue."  *Omnicare*, 135 S. Ct. at 1327.

Citing *In re Perrigo Co. PLC Sec. Litig.*, the plaintiffs respond that the *Omnicare* standard does not apply when a company must estimate liability, because the potential liability disclosure can never be considered a statement of opinion.  435 F. Supp. 3d at 587.  However, in *Perrigo*, "no exercise of judgment was required" because Perrigo's auditor advised it that its liability would be €1.6 billion.  *Id.*  "This established as a matter of fact, rather than opinion, an upper bound on the range of possible loss that was reasonably estimable."  *Id.*  Here, by contrast, the plaintiffs have not adequately alleged that MTS knew what the loss range would be at any time before November of 2018.  Any statement the company made about its potential liability would have necessarily been a statement of opinion until the company could give a reasonable estimate of its potential losses.  Accordingly, the SAC must satisfy the *Omnicare* test.  *In re*

*Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *6 (S.D.N.Y. May 24, 2018)

("[W]here there is no objective standard for an accounting decision, that decision should be

construed as a statement of opinion and be analyzed under *Omnicare*.")

The plaintiffs have not satisfied the *Omnicare* standard, which, after all, is "no small task

for an investor." *Id*. at 1332.  The plaintiffs must do more than "offer bare conclusory

allegation[s]" that the issuer "lacked reasonable grounds for the belief it stated."  *City of*

*Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 71 (S.D.N.Y. 2015)

(internal quotation and citation omitted).  Rather, they must "identify particular (and material)

facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not

conduct or the knowledge it did or did not have—whose omission makes the opinion statement

at issue misleading to a reasonable person reading the statement fairly and in context."

*Omnicare*, 135 S. Ct. at 1332.  During the Class Period, MTS stated that (i) it did not have a

reliable basis on which to predict the outcome of the investigation and (ii) it could not predict the

magnitude of any settlement.  The plaintiffs have not adequately alleged that MTS did not

actually believe what it was representing in its SEC filings.  Indeed, as explained above, the SAC

does not allege sufficient facts to establish that MTS could have predicted the outcome of the

DOJ's investigation before November of 2018.

### 2.  *Nature of the Investigations*

The plaintiffs also fault MTS for not disclosing until April 27, 2018 that the DOJ and

SEC were investigating it for FCPA violations.  In particular, the plaintiffs allege that MTS

"failed to fulfill its basic obligation under GAAP and IFRS to adequately describe the nature of

the contingency" because it did not disclose that it "faced an FCPA investigation, that the FCPA

provided rigid guidelines for penalties, and that two of its competitors had agreed to hundreds of

millions of dollars in penalties while admitting to the same illegal conduct in which MTS had itself engaged." (ECF No. 31 at ¶ 179.) They also raise a new claim in their brief: "ASC 450 and IAS 37 required MTS to describe the nature of its liability arising from the FCPA investigation." (ECF No. 36 at 17.)

MTS argues that it had no duty to disclose the details of the government's investigation. "[A]n omission is actionable under the securities law only when the corporation is subject to a duty to disclose the omitted facts." *Stratte-McClure*, 776 F.3d at 101 (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)). It is well established that "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014); *see also In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *31 ("[A]bsent an express prior disclosure, a corporation has no affirmative duty to speculate or disclose uncharged, unadjudicated wrongdoing or mismanagement." (internal quotation and citation omitted)); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) ("[F]ailure to disclose that . . . revenues were derived from 'unsustainable and illegitimate sources'" did not violate Section 10(b) because "the federal securities laws do not require a company to accuse itself of wrongdoing.").

MTS cites *Employees' Retirement System of City of Providence v. Embraer S.A.* as support for its position that it met its disclosure obligations. 2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018). Embraer reported in Form 6-K and Form 20-F filings that it the DOJ and SEC were investigating it for alleged violations of the FCPA, that it had retained outside counsel to conduct an internal investigation, and that it may face "substantial fines" or "other sanctions" as provided in the FCPA. *Id.* at *5-6. Rejecting the plaintiffs' "faulty notion that Embraer was required to disclose details of the FCPA violations and admit that it had engaged in wrongdoing—before it

had even been charged and before the investigations were even complete," the court found that Embraer's disclosures satisfied its reporting obligations. *Id.* at *4.

While not as comprehensive as Embraer's, MTS's disclosures satisfied its reporting obligations. MTS disclosed the existence of the investigation in early 2014, and warned investors of the potential for significant fines or penalties. In the April 24, 2014 Form 20-F— and in each 20-F filing thereafter—MTS included a paragraph about the Uzbekistan investigation, in which it mentioned the FCPA and other laws, stating that "any investigation of any potential violations of the FCPA, the UK Bribery Act or other anti-corruption laws by US, UK or foreign authorities could have an adverse impact on our business, financial condition and results of operations." (ECF No. 34-4 at 7.) While MTS did not explicitly state that the DOJ was investigating it for possible violations of the FCPA or that it had retained outside counsel to conduct an investigation, it warned that it could face liability under the statute as well as any other anti-corruption laws. Thus, investors were alerted to the possibility that the DOJ's investigation into conduct in Uzbekistan could result in liability under the FCPA.

The plaintiffs charge further that MTS should have "disclosed that the FCPA provided rigid guidelines for penalties." (ECF No. 31 at ¶ 179.) In fact, information about the FCPA's penalty guidelines is publicly available and MTS was under no obligation to disclose readily accessible information in its securities filings. *See, e.g.*, *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 576 (S.D.N.Y. 2013) ("[T]here is no duty to disclose information to one who reasonably should be aware of it." (quoting *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978)); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 249-50 (S.D.N.Y. 2003) ("[T]he Defendants cannot be held liable for failing to disclose . . . publicly available information."); *In re KeySpan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377

(E.D.N.Y. 2003) ("Where allegedly undisclosed material information is in fact readily accessible in the public domain, . . . a defendant may not be held liable for failing to disclose this information."). Nor do the plaintiffs cite any authority for the proposition that MTS had to disclose that VimpelCom and TeliaSonera entered into DPAs for similar misconduct. The requirement under ASC 450 and IAS 37 that a company must disclose the nature of its own liability cannot logically extend to reporting on the liabilities of competitors. Accordingly, these omissions are not actionable.

### 3. Statements Regarding Cooperation

In disclosures throughout the Class Period, MTS stated that it had "received requests for documents and information from both the SEC and DOJ and continues to cooperate with these investigations in good faith." (ECF No. 31 at ¶ 193.) The plaintiffs argue that this statement was materially false and misleading because the DOJ did not ultimately credit MTS for "cooperation and remediation" in the settlement. Had the company's statements regarding cooperation been true, the plaintiffs allege, MTS would have gotten full credit for cooperation and remediation and the total monetary penalty would have been "nearly $350 million less than the $850 million that MTS ended up paying," or an approximately 25% reduction off the low end of the USSG fine range. (*Id.* at ¶¶ 8, 128.)

To establish falsity, plaintiffs must do more than simply assert that a statement is false; "they must demonstrate with specificity why that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). "A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false at the time it was made." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir.

2015) (citing *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812-13 (2d Cir. 1996)).

The plaintiffs have not sufficiently pled that MTS's statements about cooperation were false.  In public disclosures during the Class Period, MTS represented that it was cooperating with the SEC and DOJ investigations in good faith, including by providing information and answering government requests.  (ECF No. 31 at ¶¶ 193, 194, 197, 200, 204, 207, 210, 218, 221.)  The DPA corroborates these statements.  The DOJ gave MTS a two point reduction to its score under the USSG because MTS "fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct." (ECF No. 31-2 at 10.)  The fact that MTS did not also get credit for cooperation and remediation pursuant to the FCPA Corporate Enforcement Policy does not mean that its statements about cooperation were false.[10]  MTS said nothing about how the DOJ would evaluate its cooperation, and indeed it had no way of knowing at the time of the disclosure whether it would receive additional credit; it reported only that it was cooperating with the government, which was accurate.  The plaintiffs have not alleged any facts that suggest that MTS's statements were false or misleading, nor that the statements were false or misleading when they were made. Accordingly, they have not alleged an actionable statement or omission.

### 4.   *Statements Regarding Ethics & Compliance*

MTS also challenges the plaintiff's allegations about the company's statements during the Class Period that it "complies with legislation and generally accepted standards of business

---

[10] The plaintiffs cite *Carlson v. Xerox Corp.*, 392 F. Supp. 2d 267.  Addressing only the question of scienter, the *Xerox* court found that the defendant's failure to cooperate with an SEC investigation bolstered the "already strong inference of fraudulent intent."  *Id*. at 284.  However, in *Xerox*, the SEC sanctioned the defendant for failing to cooperate with the investigation.  *Id*. at 274.  By contrast, MTS was credited for cooperating with the DOJ.

ethics" and that the code of conduct is a "fundamental document" that guides the company's

daily work and helps it to maintain a "competitive advantage."  (ECF No. 31 at ¶ 202.)  MTS

described its code of conduct as a "fundamental document, which guides us in our daily work

and helps us to protect the good name of our Company and maintain our competitive advantage."

(*Id.*)  The company also reiterated its commitment to "compliance with anti-corruption laws . . .

and ethical business conduct in all kinds of business relationships."  (*Id.* at ¶ 191.)

According to MTS, these statements are "corporate puffery," and thus cannot support a

securities claim.  Puffery includes "vague and optimistic 'statements [that] are too general to

cause a reasonable investor to rely upon them,' and thus cannot serve as the basis for a securities

fraud claim."  *Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494, 497 (2d

Cir. 2019) (summary order) (quoting *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP

Morgan Chase Co*., 553 F.3d 187, 206 (2d Cir. 2009)); *see Rombach*, 355 F.3d at 174

("[E]xpressions of puffery and corporate optimism do not give rise to securities violations.").

"Corporate codes of conduct tend to be general statements about reputation, integrity, and

compliance with ethical norms [that] are inactionable puffery—as opposed to being statements of

facts—and are, therefore, generally incapable of forming the basis for a Section 10(b) claim."

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 532

(S.D.N.Y. 2020) (citation and quotation omitted).

"[G]eneral statements about reputation, integrity, and compliance with ethical norms are

inactionable 'puffery,' meaning that they are too general to cause a reasonable investor to rely

upon them." *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (quoting *City of Pontiac*, 752

F.3d at 183); *Constr. Laborers*, 433 F. Supp. 3d at 532-34 (finding inactionable corporate code

of conduct statements).  MTS's public disclosures regarding its business ethics and internal code

of conduct use the type of "broad, aspirational, and vague" statements that are the hallmark of corporate puffery.  *Oklahoma Law Enf't Ret. Sys. v. Papa John's Int'l, Inc.*, 444 F. Supp. 3d 550, 560 (S.D.N.Y. 2020) (internal quotation and citation omitted).  Similarly, the company's "general declarations about the importance of acting lawfully and with integrity" fall "squarely within" the category of inactionable puffery.  *Singh*, 918 F.3d at 63.

In addition, the plaintiffs' claims about MTS's internal controls are not sufficiently particularized to survive a motion to dismiss.  "Where plaintiffs allege that internal controls are deficient, courts have consistently required plaintiffs to allege specific facts concerning the purportedly deficient internal controls, including how they were deficient, when and why." *Embraer S.A.*, 2018 WL 1725574, at *9 (internal quotation and citation omitted); *see also Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *9 (S.D.N.Y. Mar. 30, 2012). ("The Complaint does not allege any facts explaining why or how [the company]'s internal controls were materially deficient at the time [the company] made any of the challenged statements.").

Again citing the fact that MTS did not receive a 25% penalty reduction for cooperation or remediation, the plaintiffs say that the company could not possibly have been following its own code of conduct.[11]  As explained above, the government credited the company for its cooperation in the penalty calculation, and commended it for "continuing to enhance its compliance programs and internal accounting controls, including ensuring that its compliance program satisfies" its own corporate compliance program.  (ECF No. 31-2 at ¶ 4.)

---

[11] The plaintiffs admit that claims based on statements in MTS's 2013 Form 20-F are time-barred by the applicable statute of repose because they were not raised in the original complaint.  (ECF No. 40.)  In any event, that report pre-dates the Class Period.  *See Embraer S.A.*, 2018 WL 1725574, at *9 (citing *Cats v. Prot. One, Inc.*, 2001 WL 34070630, at *15 (C.D. Cal. June 4, 2001) ("[P]re-class period allegations of misconduct are insufficient where 'there is scant else from which to infer that this was the company's practice at any pertinent time." (internal quotation omitted)))).

Similarly, MTS's statement in its 2016 Annual Report that an independent consultant "concluded that the anti-corruption compliance program complies with the global best practices" is not actionable.  (ECF No. 31 at ¶ 212.)  The plaintiffs maintain that the statement "gave investors the false impression that MTS had actually implemented its compliance program." (ECF No. 36 at 26.)  But the statement was accurate.  The company hired a consultant and reported the consultant's findings; it did not represent that the new compliance program was fully operational.

In short, the plaintiffs have not pled sufficient facts to demonstrate that the challenged claims were false or misleading.[12]

B.      Scienter

Although I conclude that the plaintiffs have not alleged actionable statements or omissions, I also address whether they have sufficiently pled scienter.  To sustain a Section 10(b) or Rule 10b-5 action, the plaintiffs must allege that each defendant acted with scienter – "a mental state embracing intent to deceive, manipulate, or defraud" investors.  *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011)).  Plaintiffs must "allege facts that give rise to a strong inference of fraudulent intent," *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995); a "strong inference" of scienter means an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  In addition, the

---

[12] Although the Individual Defendants have not appeared in this action because the plaintiffs have not been able to serve them, "the rulings in this opinion would apply with equal force" to the Individual Defendants' own motion to dismiss.  *Le Bouteiller v. Bank of New York Mellon*, 2015 WL 5334269, at *11 n.6 (S.D.N.Y. Sept. 11, 2015); *see also Virtual Dates, Inc. v. Afternic.com, Inc.*, 2001 WL 1646451, at *2 (S.D.N.Y. Dec. 20, 2001) (dismissing claims against defendant who did not join in other defendants' motion to dismiss because "precisely the same points control the claims against it").

"[p]laintiffs must allege those facts that give rise to an inference of scienter 'with particularity.'"
*Singh*, 918 F.3d at 62 (quoting *ATSI Commc'ns, Inc*., 493 F.3d at 99).

Plaintiffs may plead scienter in two ways: by alleging facts "(1) showing that the
defendants had both motive and opportunity to commit the fraud or (2) constituting strong
circumstantial evidence of conscious misbehavior or recklessness." *In re Magnum Hunter Res.
Corp. Sec. Litig.*, 616 F. App'x 442, 445 (2d Cir. 2015) (citation omitted); *see also Boca Raton*,
506 F. App'x at 38 (citing *In re Carter–Wallace, Inc., Sec. Litig.,* 220 F.3d 36, 39 (2d Cir.
2000)).  When the defendant is a corporation, a plaintiff must plead scienter with respect to
"someone whose intent could be imputed to the corporation." *Teamsters Local 445 Freight Div.
Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

To allege scienter under the "motive and opportunity" theory, a plaintiff must show that
the defendant "benefitted in some concrete and personal way from the purported fraud."
*Woolgar v. Kingstone Companies, Inc.*, 2020 WL 4586792, at *21 (S.D.N.Y. Aug. 10, 2020).
Ordinarily a plaintiff establishes motive by alleging that "corporate insiders are alleged to have
misrepresented to the public material facts about the corporation's performance or prospects in
order to keep the stock price artificially high while they sold their own shares at a profit."  *South
Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 108 (2d Cir. 2009).  The plaintiffs do not
allege that MTS or the individual defendants "benefitted" from the alleged fraud.  Instead they
argue that the individual defendants' previous "culpable acts"—the filing of  "financial
statements with the SEC throughout 2004-2012 that improperly characterized illicit bribe
payments [to Karimova] as legitimate expenses"—gave them "a motive to continue to conceal
the FCPA violations from the public for as long as possible." (ECF No. 36 at 30.)  But as
explained above, MTS did not conceal the fact of the various investigations into its conduct; the

company disclosed that it was under investigation in 2014 and continued to provide updates as to the status of the investigation throughout the Class Period. [13]

Nor have the plaintiffs alleged enough to show conscious misbehavior or recklessness. "Conscious misbehavior or recklessness" is a "state of mind 'approximating actual intent,' which can be established by 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *City of Pontiac*, 752 F.3d at 184 (citation omitted); *see South Cherry*, 573 F.3d at 109 (To establish "conscious recklessness," the plaintiff must establish that the defendants had "a state of mind approximating actual intent, and not merely a heightened form of negligence." (citing *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000) (internal quotation marks omitted))). For this reason, "an allegation that a defendant merely 'ought to have known' is not sufficient to allege recklessness." *Hart v. Internet Wire, Inc*., 145 F. Supp. 2d 360, 368 (S.D.N.Y. 2001) (citation omitted). Where a plaintiff cannot make a showing of "motive," the "strength of the circumstantial allegations must be correspondingly greater." *ECA*, 553 F.3d at 198-99 (quotation marks and citation omitted).

A plaintiff can establish "conscious recklessness" by alleging that the defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (quotation marks and citations omitted); *see also Novak*, 216 F.3d at 308 (the plaintiff must have

---

[13] *In re Symbol Techs., Inc. Sec. Litig.* is distinguishable. 2013 WL 6330665, at *10 (E.D.N.Y. Dec. 5, 2013). In that case, the plaintiff did "not argue," as the plaintiffs in this case do, "that scienter [was] demonstrated through allegations of motive and opportunity," but rather that it was established "through allegations constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at *8.

"specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.").  The plaintiffs in this case have made no such allegations.

First, the plaintiffs make general claims about what MTS executives must have known based on their respective job titles.  They allege that the individual defendants "were well aware of the Company's FCPA liability when the Class Period began on March 19, 2014," because their roles gave them insight into the misconduct in Uzbekistan and they were aware that the SEC had opened an investigation into the misconduct.  (ECF No. 31 at ¶¶ 164, 233-37.)  For example, defendant Kornya "served as the Company's Vice President of Finance and Investment" in 2008 and allegedly "failed to implement adequate internal accounting controls" which in turn enabled MTS to disguise "over $420 million in bribe payments" on their SEC filings.  (*Id.* at ¶ 234.)  Defendants Dubovskov and Kornya allegedly had "actual knowledge that the company was ineligible for remediation credit due to its failure to adequately discipline those with supervisory authority" because those defendants would have been involved in the disciplinary process.  (*Id.* at ¶ 236.)  But "[a]ccusations . . . founded on nothing more than a defendant's corporate position[,] are entitled to no weight." *Fogel v. Wal-Mart de Mexico SAB de CV*, 2017 WL 751155, at *16 (S.D.N.Y. Feb. 27, 2017) (quoting *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 350 (S.D.N.Y. 2015)).  The plaintiffs have not alleged any facts to suggest that the individual defendants had access to information that would have helped them to approximate the appropriate amount for a reserve before November of 2018.[14]  In short, relying

---

[14] The plaintiffs also allege that defendant "Dubovskov's June 2012 letter to the Prosecutor General's Office in Uzbekistan acknowledging the illegal acts Akhmedov had arranged and the damage these payments had caused to the Company's reputation demonstrate that Dubovskov was aware of MTS's culpability for its FCPA violations before the Class Period began."  (ECF No. 31 at ¶ 237.)  This allegation does not support an inference that Dubovskov would have been in a better position to anticipate the company's U.S. liability.  His correspondence with regulators in Uzbekistan is not alleged to have had any bearing on the U.S. investigations.

on the defendants' roles within the company is "unpersuasive and incapable of raising a strong inference of scienter." *In re Ferrellgas Partners, L.P., Sec. Litig.*, 2018 WL 2081859, at *17 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 127 (2d Cir. 2019).

The plaintiffs also fault the company's statements that it could not predict its ultimate liability; the plaintiffs say that MTS knew from an internal investigation by Debevoise & Plimpton that "it had probable liability for its own illegal bribes and would have to pay a substantial amount in fines and penalties." (ECF No. 31 at ¶ 158.) The plaintiffs seem to suggest that the internal investigation revealed enough information for the company to estimate the amount of a total fine before November of 2018. However, the SAC does not allege that the internal investigation actually yielded such information. Indeed, the SAC only alleges that Debevoise conducted an investigation; it does not include any findings. Moreover, "the fact that [MTS] commenced an internal investigation tends to undermine any inference of scienter." *City of Brockton Ret. Sys. v. Avon Prod.*, Inc., 2014 WL 4832321, at *24 (S.D.N.Y. Sept. 29, 2014). *See also Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir.2010) (finding that scienter was not sufficiently pled where the "facts [did] not support an inference that [the defendant] was trying to hide anything from its investors. Rather, they suggest[ed] that [the defendant] . . . was endeavoring in good faith to ascertain and disclose future losses.").

The plaintiffs repeat their claims about MTS's statements regarding cooperation, arguing that the defendants' "repeated assurances to investors that the Company was fully cooperating with investigators were false and misleading because Defendants knew at the time these statements were made that the Company was ineligible for maximum credit for full cooperation[.]" (ECF No. 31 at ¶123.) As explained above, the company's statement that it was cooperating with investigators was accurate when it was made.

Nor have the plaintiffs established corporate scienter.  A plaintiff can show corporate scienter by pleading facts sufficient to create a strong inference either (1) that "someone whose intent could be imputed to the corporation acted with the requisite scienter," *Teamsters Local 445*, 531 F.3d at 195-196, or (2) that "a corporate statement is so important and dramatic that it 'would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false,'" *Vining v. Oppenheimer Holdings Inc.*, 2010 WL 3825722 at *13 (S.D.N.Y. Sept. 29, 2010) (citing *Teamsters Local 445*, 531 F.3d at 196 (internal citation omitted)).  "In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant.  But it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Teamsters Local 445*, 531 F.3d at 195.  Because the plaintiffs have not established that any individuals within the company acted with the requisite scienter, they would have to show that MTS made a statement so important and dramatic that it would have been approved by corporate officials sufficiently knowledgeable about the investigations into MTS's misconduct in Uzbekistan to know that the statement was false.  The "[p]laintiffs have not asserted, nor could they, that the statements at issue in this case are of that ilk." *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 301 (S.D.N.Y. 2019).

Accordingly, the plaintiffs have not established conscious recklessness.

## II.    Section 20(a) Claim

The plaintiffs also allege "controlling person liability" against the Individual Defendants pursuant to Section 20(a), 15 U.S.C. § 78t(a).  *See Levy v. Maggiore*, 48 F. Supp. 3d 428, 439-40 (E.D.N.Y. 2014) (citations omitted).  Under Section 20(a), "every person who, directly or indirectly, controls any person directly liable under the Securities Exchange Act" is also liable.

*Levy*, 48 F. Supp. 3d, at 439-40 (citing *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 371 (2d Cir. 2014) (internal quotation marks and alterations omitted) (quoting 15 U.S.C. § 78t)).  A party cannot be held both primarily and secondarily liable for Exchange Act violations, but a plaintiff may allege both as alternative theories of liability at the pleading stage.  *Id.* at 440 (citing *Szulik v. Tagliaferri*, 966 F. Supp. 2d 339, 368-69 (S.D.N.Y. 2013); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001); *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001)).

Since the plaintiffs have not identified any actionable misstatements or adequately alleged scienter, they have not adequately pled a Section 10(b) claim.  Therefore, their Section 20(a) control person claim fails as well, as control person liability under Section 20(a) depends on a primary violation of Section 10(b).  Though the Individual Defendants have not yet appeared in this action, I dismiss the plaintiffs' 20(a) claim against them on these grounds.

## CONCLUSION

The defendants' motion to dismiss the complaint is granted.[15]

**SO ORDERED.**

s/Ann M. Donnelly

ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
        March 1, 2021

---

[15] I have given the plaintiffs two opportunities to amend their complaint; the plaintiffs have not asked to file a third amended complaint.  *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003) ("[I]t is well established that leave to amend a complaint need not be granted when amendment would be futile.")